**Stanley JOHNSON, Plaintiff,**

v.

**THE KROGER CO., Defendant.**

No. C–2–98–1173.

United States District Court,
S.D. Ohio,
Eastern Division.

March 30, 2001.

Emily Jane Lewis, Farlow & Lewis LLC, Dublin, OH, for Plaintiff.

Bradd Nathan Siegel, Porter Wright Morris & Arthur, Columbus, OH, for Defendant.

## *OPINION AND ORDER*

GEORGE C. SMITH, District Judge.

Plaintiff asserts, *inter alia*, claims for federal and state law racial discrimination and wrongful discharge. This matter is before the Court on defendant's motion for summary judgment. Based on the following, defendant's motion for summary judgment is granted.

## I. FACTS

Plaintiff began his employment with defendant as a management trainee in August 1986. During his first six months with defendant, plaintiff received training on the various aspects of the operation of a retail grocery store, including customer service, budgets, purchasing, and aspects unique to each particular store department. Plaintiff completed the training program with mostly satisfactory ratings.

After training, plaintiff was assigned to work as the junior co-manager, or assistant manager, of a store in Toledo. Plaintiff was then transferred to work as the junior co-manager of defendant's Findlay store. After his assignment in Findlay, plaintiff was transferred to defendant's Portsmouth store in 1989. He worked under the store's manager, Don Allison, and senior co-manager, Denis Kirkbride. As was customary, plaintiff, as the more junior co-manager, was generally responsible for departments the senior co-manager did not want to supervise (Johnson Depo., p. 90). Generally, this left plaintiff responsible for his store's perishable food departments, including produce, deli, meat, dairy, and floral (Johnson Depo., pp. 92, 121). Co-managers were accountable to the store manager, who in turn was accountable to the Zone, or district, Manager, who had the responsibility of overseeing several stores in a certain geographic region. In late 1991 and early 1992, Randy Roberts replaced Allison as the Portsmouth store manager, and Paul Gaines replaced Kirkbride as the senior co-manager. Sometime during 1994, Gaines was replaced by Maureen Bassler.

In January 1995, Zone Manager Ed McCauley transferred plaintiff to the Wheelersburg store to alleviate a personnel problem involving another co-manager in another store in that region. At Wheelersburg, plaintiff was the only co-manager and worked under store manager Dan Newman. Plaintiff viewed transfer to Wheelersburg as a demotion based upon previous comments by Kirkbride. He was also reluctant to accept the transfer based upon the racial composition of Wheelersburg, and what he perceived as a reputation for racial intolerance. Plaintiff expressed his reservations to McCauley. Plaintiff did, however, accept the transfer because he did not want to be on McCauley's "bad side" (Johnson Depo., p. 202).

At a meeting of department heads at the Wheelersburg store held prior to plaintiff's arrival, Newman stated that plaintiff "did not have reputation of being the best co-manager," but that the department heads should "work with him and see what [they] could do" (Newman Depo., p. 37; see also Tackett Depo., pp. 8–10; Cooper Depo., pp. 8, 42). Several weeks after plaintiff began work at Wheelersburg, Newman also expressed displeasure with one of his management decisions in front store vendors (Johnson Depo., p. 222). Six months later, Newman overrode plaintiff's management decision to allow an employee to wear a sweatshirt during work for a promotion defendant had ongoing. Plaintiff testified he felt humiliated in front of the employee (Johnson Depo., p. 224).

According to plaintiff, Newman treated him differently than other white co-managers. Newman did not mentor or train plaintiff as he did white co-managers. Newman interacted more with white co-managers. Newman ignored plaintiff and was away from the store more often. Newman would also clean off his desk and pile his paperwork on plaintiff's desk in order to make himself look better to the Zone Manager. (Doc. 35, p. 8).

In late 1995, McCauley was transferred to the northwest Ohio region and was replaced by Nancy Noyes. On one of her first walk-throughs of the Wheelersburg store in November 1995, plaintiff was the

only manager on duty. Noyes noted that bananas in the produce department were in poor condition and their price had not been marked down, the meat case contained dark meat that had not been marked down, plaintiff seemed unclear as to defendant's markdown policy, and the dairy department was in poor condition (Noyes Aff., ¶ 4).

In her notes made during the December 1995 walk-through, Noyes observed that these same problems existed. In addition, grocery shelves were dirty and not properly conditioned, shelf stock was low, some "red-tag" sale items were out of stock, plaintiff could not answer questions about the store's budget and sales figures, the back room was unorganized, and the front entrance was dirty (Noyes Aff., ¶ 5). As a result of these walk-throughs, Noyes and Newman rated plaintiff's performance as "marginal" in his January 1996 performance appraisal.

Zone Coordinator Jeff Shaffer also documented what he believed were instances of plaintiff's poor performance and lack of knowledge. Shaffer indicated that he attempted to clarify defendant's cost billing policy with plaintiff, but that plaintiff was unable to understand the process. He also communicated that plaintiff did not understand the concept of "good backstock" and that he seemed to not understand defendant's "ribboning" process (Johnson Aff., Exh. U).

Plaintiff requested a transfer several times during 1995 and 1996 because of what he believed was a racially hostile working environment created by Newman (Doc. 35, p. 10). Plaintiff was not granted a transfer. As a result of plaintiff's marginal rating in performance appraisals, Noyes considered terminating plaintiff's employment. In a discussion with Noyes, Newman indicated that he was satisfied with letting plaintiff continue as a "babysitter" for the store, content with the belief that plaintiff's performance would never improve (Newman Depo., pp. 212–213). In order to utilize plaintiff's customer relations skills though, Noyes offered plaintiff a position as a Service Director. Plaintiff declined this offer because he believed it was a demotion. Plaintiff was then terminated on November 2, 1996. Plaintiff filed a compliant with the EEOC, which was unable to find a violation of Title VII.

Plaintiff then brought this action asserting claims for: (1) racial discrimination, harassment, and retaliation under Title VII; (2) racial discrimination under R.C. § 4112.99; (3) wrongful discharge in violation of public policy; (4) intentional infliction of emotional distress; and, (5) breach of contract.

## II. SUMMARY JUDGMENT STANDARD

The standard governing summary judgment is set forth in Fed.R.Civ.P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d

265 (1986); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

When reviewing a summary judgment motion, the Court must view all of the evidence in the record. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2110, 147 L.Ed.2d 105 (2000). The Court must draw all reasonable inferences in favor of the nonmoving party, and must refrain from making credibility determinations or weighing the evidence. *Id.* Although the Court views the entire record, it disregards all evidence favorable to the moving party that the jury is not required to believe. *Id.* Stated otherwise, the Court must credit evidence favoring the nonmoving party as well as evidence favorable to the moving party that is uncontroverted or unimpeached, if it comes from disinterested witnesses. *Id.*

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby, Celotex* and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1476 (6th Cir.1989). The court in *Street* identified a number of important principles applicable in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479. In addition, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (quoting *Liberty Lobby,* 477 U.S. at 257, 106 S.Ct. 2505). The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely "'show

that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348).

### III. DISCUSSION

Plaintiff's first claim asserts that defendant discriminated against him because of his race in violation of Title VII of the Civil Rights Act of 1964. Plaintiff has alleged that numerous actions by defendant were discriminatory in violation of law. Specifically, plaintiff alleges that defendant discriminated against him because of his race in: (1) transferring him to the Wheelersburg store; (2) denying him training; (3) evaluating him more harshly than other white managers; (4) failing to give him a probationary period prior to his termination and grant his transfer request; and, (5) his termination. Plaintiff also asserts that defendant retaliated against him for seeking counsel and filing a complaint for past racial harassment in violation of Title VII. He also asserts that harsh and critical comments by Noyes and Newman created a hostile work environment in violation of Title VII.

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(A)(1). In an employment discrimination action the plaintiff may prove discrimination by direct evidence or by establishing a *prima facie* case. The elements of a *prima facie* case of employment discrimination are: (1) that the plaintiff is a member of a protected class; (2) that the plaintiff was qualified for the position; (3) that the defendant subjected the plaintiff to an adverse employment action; and, (4) that the defendant did not subject similarly situated persons outside the protected

class to such adverse action. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If the plaintiff establishes a *prima facie* case, then the burden shifts to the defendant to come forward with a legitimate, non-discriminatory reason for the adverse action against the plaintiff. *See Hicks,* 509 U.S. 502, 506–07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Dept. of Comm. Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the defendant comes forward with a legitimate, non-discriminatory reason for its actions, then the burden shifts to the plaintiff to prove that the defendant's proffered reason is a mere pretext for discrimination. *See Hicks,* 509 U.S. at 512, n. 4, 113 S.Ct. 2742; *Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207. "The nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207.

### DIRECT EVIDENCE

 Plaintiff alleges that direct evidence of race discrimination exists in this case. According to plaintiff, the direct evidence consists of a comment by Newman, just prior to plaintiff's transfer, that plaintiff's transfer was going to hurt business because there were few black families in Wheelersburg (Gaines Depo., p. 11, 58, 59). Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's adverse actions. *See Jacklyn v. Schering–Plough Healthcare Products Sales Corp.,* 176 F.3d 921, 926 (6th Cir.1999). For example, a facially discriminatory employment policy or a decision-maker's express statement of desire to terminate employees in the protected group is direct evidence of discriminatory intent. *See Nguyen v. City of Cleveland,* 229 F.3d 559, 562 (6th Cir.2000)(citing *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985)). Direct evidence is not demonstrated through stray remarks, remarks by non-decision makers, comments that are vague, ambiguous, or isolated, and comments that are not proximate in time to the act of termination. *See Martin v. U.S. Playing Card Co.,* 172 F.3d 48, 1998 WL 869970, *4 (6th Cir.1998)(citing *Cooley v. Carmike Cinemas, Inc.,* 25 F.3d 1325, 1330 (6th Cir. 1994)).

Plaintiff was terminated in November 1996. Newman made the comment at issue prior to plaintiff's transfer in January 1995—almost two years prior to plaintiff's termination. The comment merely echoed plaintiff's feeling upon hearing of his transfer to Wheelersburg:

A: No. I expressed, at that time, that I was reluctant to go there, knowing of the racial intolerance that was characteristic of that area.

(Johnson Depo., p. 201). Plaintiff has also presented no evidence of other similar comments made by Newman during plaintiff's tenure at Wheelersburg. The comment at issue was thus appears to be stray, isolated, and not proximate in time to plaintiff's termination. It therefore cannot be direct evidence of defendant's discriminatory intent as a matter of law.

### PLAINTIFF'S TRANSFER TO WHEELERSBURG

 Plaintiff alternatively argues that he has met his burden of persuasion in demonstrating a *prima facie* case of discrimination. Plaintiff asserts that his

transfer from Portsmouth to Wheelersburg was an adverse employment action and based on his race. Yet, the evidence indicates that race did not play a factor in the decision and the employment action was arguably not adverse. The Sixth Circuit has held that "reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims." *See Kocsis v. Multi–Care Mgmt. Inc.*, 97 F.3d 876, 885 (citing *Yates v. Avco Corp.*, 819 F.2d 630, 638 (6th Cir.1987)). Plaintiff testified that his pay and benefits were not altered in any way upon his transfer to Wheelersburg (Johnson Depo., p. 212). Plaintiff has also not presented evidence that his transfer caused him to be treated worse than similarly situated white employees. Two other white co-managers, Kirkbride and Bill Billiter, were transferred at the same time as plaintiff in the same three-way co-manager swap (Johnson Depo., p. 209–211). Defendant reasonably believed that plaintiff's transfer benefitted him as it gave him greater responsibility as the sole co-manager in a one co-manager store rather than a junior co-manager in a two co-manager store. As a result, it would enable plaintiff to demonstrate his skill in supervising and managing an entire store rather than solely the perishable foods departments. Plaintiff testified as such in his deposition (Johnson Depo., p. 190–191).

Plaintiff has also not presented evidence that the transfer was based on his race. Rather, the evidence clearly demonstrates that the choice to transfer plaintiff was a business decision based upon potential problems occurring between Kirkbride and one of his subordinates. It appears defendant attempted to move plaintiff to another store in the most convenient manner by transferring him to Wheelersburg, which was only twelve miles away from Portsmouth. Plaintiff's argument is therefore without merit.

## PLAINTIFF'S DENIAL OF ONGOING TRAINING

Plaintiff also argues that his denial of ongoing training with defendant was an adverse employment action. Defendant has testified that his training was on a "catch-as-catch-can" basis (Johnson Aff ., ¶ 8). Yet, Gaines testified that this piecemeal type of training is common depending on the manager a co-manager works under:

Q: Are other managers or co-managers or people that are supposed to be moving up the ladder trained in these things earlier in their career?

A: It depends on who they're working for.

Q: Okay.

A: You'll get some store managers that want you to run the store for them. So they'll train you to do just about everything you can possibly do even in their capacity so they could have more free time and everything.

(Gaines Depo., p. 14). Kirkbride testified similarly:

Q: So co-manager after you received your initial management training were expected to learn from each other, to show initiative and ask questions and learn from managers they came in contact with?

A: Yes. Basically the way to learn was through those that came before you.

. . .

Q: And you attempted to share your job knowledge with Mr. Johnson when he asked?

A: Yes. . . . But as most co-managers will say similar to paperwork most managers were not interested in computers or learning them. And again it fell upon

the co-managers to pretty much learn as much as they could to offset that.

(Kirkbride Depo., pp. 31–32).

██ Plaintiff also testified at deposition that he did learn paperwork, such as the budgeting and inventory control processes, from Roberts. Plaintiff testified:

Q: At the bottom it says: "1992 was by far the best year I have had with the Kroger Company with regard to management skills. Due to unfortunate circumstances I had the opportunity to work extensively with the budgets and inventory control. Mr. Roberts has included me in his analysis of the operating statement and these discussions have increase [sic] my knowledge of our business." Does that refresh your recollection as to what you were doing?

A: Yes. Dennis or Paul or somebody had to be out of the picture for me to get that kind of experience with the budgets and inventory.

. . .

Q: It says: "Mr. Roberts has included me in his analysis of the operating statement." What do you mean by that?

A: I would sit down with him when he did the budgets. That was probably the first time I had really been involved in the budgets. He was doing most of the decision-making, but I could make some input. He was telling me stuff. I would input the numbers in the computer, and I could kind of see the process that went behind it. In that regard, it was very enlightening. I had not had that experience before.

(Johnson Depo., p. 189–190). Plaintiff contradicted this testimony in his affidavit: "I received very little training in other aspects of the store's operations, such as . . . budgets" (Johnson Aff., ¶ 7). This affidavit is dated May 25, 2000, one day before plaintiff filed his responsive brief in this case to which the affidavit was attached. A party cannot create a factual issue by filing an affidavit which contradicts earlier deposition testimony after a motion for summary judgment has been made. If an affidavit is untimely and inconsistent with prior discovery responses, it is inadmissible and should not be considered. *See Hughes v. Vanderbilt Univ.,* 215 F.3d 543, 549 (6th Cir.2000); *Moore v. Ohio River Co.,* 960 F.2d 149, 1992 WL 78104, *3 (6th Cir.1992)(unpublished opinion).

Plaintiff also claims he was denied perishables training and that other similarly situated white employees were selected over him (Johnson Depo., p. 309–314). Yet, Noyes testified that the training was designed in 1995 and that it was designed for co-managers with less than two years experience (Noyes Depo., p. 81). She also testified that the number of open spaces in each class were limited and that not all co-managers in a zone could attend (Noyes Depo., p. 81). It appears therefore, that even if this constituted an adverse employment action for plaintiff, he was not similarly situated in that he had been employed with defendant longer than other white co-managers in the zone.

Noyes also testified that, after she had "walked" a store, if she felt that someone needed training in a certain area, she would arrange for that person to receive help (Noyes Depo., pp. 71–73, 79). She would inform Newman to assist plaintiff in understanding budgets and schedules. She also testified that she made sure "he [knew] how to find the answers" (Noyes Depo., p. 73). As a result, plaintiff's argument is not well-taken.

## PLAINTIFF'S PERFORMANCE EVALUATIONS

██ Plaintiff also contends that white co-managers were evaluated in a less strict manner than he was, and that defendant utilized different standards when evaluating his performance. Plaintiff discusses at great length his disagreement with his

evaluation by McCauley in 1996 (Doc. 35, pp. 13–14). Yet, he does not present evidence of other similarly situated white co-managers who received superior evaluations for the same work. Plaintiff, in fact, admits that he had no idea what type of criticisms Noyes had of other co-managers in the zone (Johnson Depo., pp. 344–345). He also testified that he was not aware of how other white co-managers in the zone were evaluated (Johnson Depo., pp. 237–238). He further testified that he did not know how his performance compared with that of other white co-managers in the zone (Johnson Depo., pp. 237–238).

In addition, plaintiff fails to deny many of the alleged instances that brought about his termination. Plaintiff testified that he had only a "general understanding" of the defendant's policy for marking down dark meat (Johnson Depo., p. 244). Plaintiff also testified that the poor condition of the dairy case likely resulted from Noyes having greater expectations for the store than he did (Johnson Depo., p. 247). Plaintiff also testified that he "kind of had an idea what we were doing" with budget and sales sheets, even though he could not convey this information to Noyes when asked as was expected from management during walk-throughs (Johnson Depo., p. 256–258; Gaines Depo., p. 40). Plaintiff testified it was not unreasonable for Noyes to ensure plaintiff knew this information (Johnson Depo., pp. 258). Plaintiff also admitted that the store did not meet standards during a walk-through prior to an Independence Day holiday weekend, and that the store was out of buns, which was an ad feature that week (Johnson Depo., pp. 316–317). It thus appears that plaintiff's evaluation was reasonable in light of the many concerns that Noyes had with plaintiff's knowledge of operational aspects of the store and its appearance when he was the manager-in-charge (Noyes Depo., p. 68).

## DEFENDANT'S FAILURE TO GRANT TRANSFER/PLACE PLAINTIFF ON PROBATION

Plaintiff also contends that defendant discriminated against him in failing to grant his transfer request and failing to place him on formal probation prior to his termination (Doc. 35, pp. 28–30). Plaintiff stated in his Responsive Memorandum that McCauley testified that "it is Kroger's practice to transfer management personnel who are not working out at a certain location to a different store. This gives them a new environment, new change" (Doc. 35, pp. 14, 29). Yet, McCauley truly testified that whether a manager or co-manager is placed on a formal probationary status is up to the Zone manager or the store manager (McCauley Depo., pp. 85–86). He also testified that some Zone managers transfer managers and co-managers that are not working out while others do not (McCauley Depo., pp. 70–72).

Plaintiff also set forth in his Responsive Memorandum that "Kroger's practice is to advise managers of specific performance issues and, before discharge, they [sic] should meet with their supervisor and a Human Resources representative to pinpoint issues and enter into a formal probationary period or corrective action period for which specific performance goals are set" (Doc. 35, pp. 29–30). Yet, he does not give any citation from where this statement is derived. Evidently, this is a recklessly "loose" paraphrase of Ed McCauley's testimony. Unfortunately, McCauley never testified as such. Rather, he said, in one instance, this was the procedure followed (McCauley Depo., p. 87–88).

Nonetheless, at the time plaintiff was terminated, McCauley was no longer serving at the Zone manager for Wheelersburg, and his ability to identify white employees he has counseled prior to termination is not relevant (McCauley Depo.,

pp. 82–89). Plaintiff has presented no evidence that plaintiff's Zone manager at the time prior to his termination, Nancy Noyes, ever granted a similarly situated white employee a transfer or placed a management employee on probation prior to termination (Johnson Depo., pp. 352–355). In fact, Noyes testified that she did not grant transfers to employees who were not performing well because she felt granting a transfer request was a recommendation that an employee was doing well (Noyes Depo., p. 186).

### PLAINTIFF'S TERMINATION

■ Defendant concedes that plaintiff is able to establish a *prima facie* case of discrimination based upon race in plaintiff's termination. It cites plaintiff's poor job performance, however, as the legitimate, non-discriminatory reason for plaintiff's termination. Defendant has come forward with evidence that plaintiff did not demonstrate the qualities that a co-manager with nine years of experience was expected to possess and that he continued to struggle to grasp management concepts in 1995 and 1996 (See, e.g. Johnson Depo., p. 308; Johnson Depo., Exh. T). In fact, throughout his time with defendant, plaintiff had trouble meeting expectations and objectives, including demonstrating a general working knowledge of overall store procedures (Johnson Depo., 82–88, 165–169; Allison Depo., pp. 18–26, 54–56; Roberts Depo., 101–108). Plaintiff continued to have problems during Noyes' periodic walk-throughs as discussed *supra*. Noyes testified that the essence of plaintiff's problems was a failure to consider or perform more than one task at a time, as was required of his position (Noyes Depo., p. 170). Plaintiff concedes that many of the concerns Noyes brought to his attention were accurate (Johnson Depo., pp. 242–244; 308; 314–317).

Plaintiff attempts to rebut this evidence with evidence that he demonstrated excellent "people skills" and that he was well-liked. He has set forth testimony of his subordinate employees that indicate he was an effective co-manager (Doc. 35, p. 11). Carol Tackett and Barb Apel testified that plaintiff was the best co-manager ever assigned to the Wheelersburg store (Tackett Depo., p. 18; Apel Depo., pp. 14–15). Tom Gunnoe, Sherry Bobst, and Diana Grove testified that plaintiff was as effective as a co-manager as Kirkbride, Gaines, or Billiter (Gunnoe Depo., p. 12; Bobst Depo., pp. 11–12; Groves Depo., pp. 9–10). Jarrells testified that plaintiff was a fantastic co-worker and a hard worker (Jarrells Depo., pp. 9–10).

Plaintiff is correct that all of the subordinates with whom he worked testified that plaintiff was good with customers, and generally a good co-manager. Yet, Noyes testified that plaintiff was terminated for failing to understand the operational side of defendant's stores rather than his people skills (Noyes Depo., p. 68, 181). These subordinates concede they were without the knowledge to form an opinion as to plaintiff's ability to perform the operational duties required of a manager (Bobst Depo., pp. 11–12; Gunnoe Depo., pp. 18–19; Jarrells Depo., pp. 20–21 Apel Depo., p. 41; Tackett Depo., pp. 15, 25–26; Groves Depo., pp. 16–17, 19–22). Plaintiff's substandard job performance is therefore a legitimate, non-discriminatory reason for his termination.

### RETALIATION

■ Plaintiff also contends that his termination and defendant's actions leading up to his termination, including a surprise Sunday store walk-through, were in retaliation for seeking legal counsel for which a letter of complaint was sent to defendant on April 8, 1996 (Doc. 35, pp. 20, 35). The elements of a *prima facie* case of retaliation are that: (1) plaintiff was engaged in a protected Title VII activity or

proceeding; (2) plaintiff was subject to an adverse employment action subsequent to or contemporaneous with the protected activity; and (3) there is a causal connection between the protected activity and the adverse employment action. *See Jackson v. Pepsi–Cola, Dr. Pepper Bottling Co.,* 783 F.2d 50, 54 (6th Cir.1986). The letter sent by plaintiff's previous counsel, however, nowhere raised the issue of plaintiff's alleged complaint of discrimination. Rather, it simply set forth that plaintiff and Newman did not get along and suggested plaintiff's transfer would resolve the problem (Johnson Aff., Exh. F). Therefore, it does not appear to be a protected activity because race was in no way implicated. The evidence also indicates that Noyes had informed plaintiff it would be in his best interest to seek another job in March 1996 (Johnson Depo., pp. 230–231, 240). As such, the letter of April 8, 1996 from plaintiff's previous counsel could not have caused plaintiff's termination.

## HOSTILE WORK ENVIRONMENT

■■■■■ Plaintiff asserts that harsh and critical comments and tone by Noyes and Newman created a hostile work environment in violation of Title VII. Hostile work environment harassment must be subdivided further into harassment by supervisors and harassment by co-workers. See *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 803–04 (6th Cir.1994). If the harassing party is the plaintiff's supervisor, the employer's liability is vicarious under agency principles. See *Fleenor v. Hewitt Soap Co.,* 81 F.3d 48, 50 (6th Cir.1996)(citing *Kauffman v. Allied Signal, Inc.,* 970 F.2d 178, 183–84 (6th Cir. 1992)). However, if the harassing party is plaintiff's co-worker, the employer's liability is direct rather than derivative based upon the employer's failure to take prompt and appropriate corrective action. See *Pierce,* 40 F.3d at 804; see also *Fleenor,*

81 F.3d at 50. It is undisputed that Noyes and Newman were plaintiff's supervisors.

■■■■■ Title VII creates a cause of action based on the presence of a hostile working environment where the workplace is "permeated with discriminatory intimidation, ridicule, or insult that is sufficiently pervasive to alter the conditions of the victim's employment...." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). For a plaintiff to establish a *prima facie* Title VII claim of hostile work environment harassment by a supervisor based on race, he must demonstrate that the following elements are present: (1) he was a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment complained of was based upon race; (4) the harassment unreasonably interfered with the plaintiff's work performance and created a hostile or offensive environment that was severe and pervasive; and, (5) the employer knew or should have known of the charged harassment and failed unreasonably to take prompt and appropriate corrective action. *See Fenton v. HiSAN,* 174 F.3d 827, 829–30 (6th Cir.1999); *Blankenship v. Parke Care Centers, Inc.,* 123 F.3d 868, 872 (6th Cir.1997)(citing *Fleenor,* 81 F.3d 48, 50 (6th Cir.1996)).

■■■■■ Plaintiff must prove that the comments by Noyes and Newman amounted to severe and pervasive harassment. *See Harris,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). In determining whether the harassment was severe or pervasive, the Court must consider the totality of the circumstances. *See id.* at 23, 114 S.Ct. 367; *Williams v. General Motors Corp.,* 187 F.3d 553, 562 (6th Cir. 1999). Factors relevant to determining this issue include: (1) the frequency of the discriminatory conduct; (2) the severity of the discriminatory conduct; (3) whether

the discriminatory conduct is physically threatening or humiliating, or a mere offensive utterance; (4) whether the discriminatory conduct interfered with an employee's work performance; and (5) whether the plaintiff actually found the environment abusive. *Harris*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

Plaintiff has presented evidence that Noyes told him that he lacked intelligence and did not have an analytical mind (Johnson Depo., p. 344). He also testified that Noyes' tone of voice was more harsh toward him than others similarly situated and that her comments amounted to "verbal abuse" (Johnson Depo., p. 344). He also presents evidence that Randy Roberts called blacks "black boys" when referring to black people other than plaintiff (Johnson Depo., p. 181). He also presents evidence that Newman told department heads prior to his arrival that his presence would have a detrimental effect on business. He also testified that Newman verbally abused and embarrassed him in front of vendors and store employees (Johnson Depo., p. 222).

Resolving inferences in favor of plaintiff, even if these allegations are true, they are not sufficiently severe and pervasive to rise to the level of creating a hostile work environment. Plaintiff's testimony about Roberts "black boy" references would unarguably have had to occur prior to his transfer to Wheelersburg in January 1995, almost two years before plaintiff's termination. Plaintiff also testified that he was able to work effectively most of the time with Roberts (Johnson Depo., p. 181). Newman's comment about plaintiff's effect on business occurred no later than January 1995, and out of plaintiff's presence. Plaintiff did not learn of the comments until he had been at the Wheelersburg store for three or four months (Johnson Depo., p. 216). Newman, in fact, told his employees that they were to refrain from use of racially insensitive language (Bobst Depo., p. 8; Cooper Depo., p. 19; Jarrells Depo., pp. 18–20). Plaintiff admits that his only evidence is "deduction" (Johnson Depo., p. 226). Plaintiff also testified that Newman's embarrassing reprimands in front of vendors and employees occurred only once right after his transfer and never again (Johnson Depo., p. 223). Plaintiff also testified that Newman's harsh tone and words were directed at other white employees. Plaintiff testified that Billiter, who was related to Newman, told plaintiff that he did not have a high regard for Newman because of his autocratic style (Johnson Depo., p. 227).

Noyes' comments, without evidence of other similar comments by her, do not indicate that they were based on plaintiff's race. Plaintiff's subjective beliefs of the meaning of arguably racial neutral comments are insufficient to prove racial animus. *See Betkerur v. Aultman Hospital Ass'n*, 78 F.3d 1079, 1095 (6th Cir.1996). Rather, the comments must be both subjectively and objectively objectionable before they are actionable. *See Crawford v. Medina Gen. Hospital*, 96 F.3d 830, 835 (6th Cir.1996)(objectively hostile environment part of *prima facie* case of ADEA and Title VII discrimination). In addition, plaintiff has presented no evidence that the work environment was physically threatening or that the comments affected his job performance.

### V. CONCLUSION

Because plaintiff has failed to adduce more than a scintilla of evidence that defendant discriminated against him based on his race, plaintiff's Title VII claim is hereby dismissed. As the Court has dismissed plaintiff's federal claim, it declines to exercise supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367(c)(3).

Based on the foregoing, defendant's motion for summary judgment is hereby **GRANTED**. The Court dismisses plaintiff's federal claim with prejudice and state law claims without prejudice.

The Clerk shall remove document 27 from the Court's pending motions list.

**IT IS SO ORDERED.**