**IN THE COURT OF CLAIMS OF OHIO**

| | |
|---|---|
| KIMBERLY JONES | Case No. 2023-00266JD |
| Plaintiff | Judge Lisa L. Sadler |
| v. | Magistrate Robert Van Schoyck |
| THE OHIO STATE UNIVERSITY WEXNER MEDICAL CENTER | <u>DECISION</u> |
| Defendant | |

{¶1} On September 12, 2024, Defendant filed a Motion for Summary Judgment pursuant to Civ.R. 56(B), asserting that it is entitled to judgment as a matter of law because Plaintiff cannot prevail on her claims of unlawful age and sex discrimination. Plaintiff filed a memorandum in opposition, and Defendant filed a reply in support. Pursuant to L.C.C.R. 4(D), the Motion for Summary Judgment is now fully briefed and is before the Court for a non-oral hearing. For the reasons stated below, the Court GRANTS Defendant's Motion for Summary Judgment.

**Standard of Review**

{¶2} Motions for summary judgment are reviewed under the standard set forth in Civ.R. 56(C), which states, in part:

> Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law.
>
> No evidence or stipulation may be considered except as stated in this rule.

"[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record before the trial court which

demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996).

{¶3} To meet this initial burden, the moving party must be able to point to evidentiary materials of the type listed in Civ.R. 56(C). *Id*. at 292-293. If the moving party meets its initial burden, the nonmoving party bears a reciprocal burden outlined in Civ.R. 56(E), which provides that "an adverse party may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."

{¶4} When considering the evidence, "[a]ny doubt must be resolved in favor of the non-moving party." *Pingue v. Hyslop*, 2002-Ohio-2879, ¶ 15 (10th Dist.). It is well-established that granting summary judgment is not appropriate unless, construing the evidence most strongly in favor of the nonmoving party: (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, that conclusion being adverse to the nonmoving party. *Robinette v. Orthopedics, Inc.*, 1999 Ohio App. LEXIS 2038, 7 (10th Dist. May 4, 1999).

**Statement of Facts**

{¶5} Plaintiff was hired in 2017, at the age of 48, as Director of Central Sterile Supply (CSS) by Defendant. (Complaint, ¶ 9.) As Director, Plaintiff oversaw the surgical instrument decontamination and sterilization process which serviced the entirety of OSU's healthcare system. (Complaint, ¶ 10.) At the time of Plaintiff's hiring, her direct supervisor was Armin Rahmanian, Administrator of Perioperative Services and Critical Care. (Complaint, ¶ 11; Jones Deposition, p. 19.)

{¶6} In 2017, while under Rahmanian's supervision, Plaintiff attended many meetings to discuss surgical instruments that some of Defendant's providers found to be unsanitary, which resulted in surgeries being delayed. (Jones Deposition, pp. 25-26.) Plaintiff routinely sparred with stakeholders, pushing back on what she felt were non-evidence-based approaches utilized by physicians. (*Id.*) After these meetings, multiple complaints were filed against Plaintiff for her demeanor and body language. (*Id.*) After

one such meeting, Brenda Kendall, Administrator of Surgical Services, suggested professionalism coaching. (*Id.* at pp. 32-35.) In response to these complaints and her experience in these meetings, Plaintiff requested and received coaching from a professionalism coach who worked in Defendant's human resources department. (*Id.* at pp. 18, 26.)

{¶7} In February 2021, Defendant opened a new offsite processing center to service newly incorporated facilities, and some of CSS's work shifted to that building, but according to Plaintiff CSS did not have the budget to adequately staff its operations. (*Id.* at pp. 2, 29, 52-53.) By May 2021, CSS was experiencing high employee turnover and overtime rates and CSS "began to see the operations start to fall apart in May of '21." (*Id.* at pp. 24, 62.) Rahmanian, Plaintiff's supervisor, resigned in June 2021. (*Id.* at p. 24.) Plaintiff then temporarily reported to Rahmanian's supervisor, Dennis Delisle, who put together a team of stakeholders to address issues with CSS and directed Plaintiff to hire traveling staff and provided other assistance. (*Id.* at p. 62.)

{¶8} In August 2021, Defendant hired Benjamin Lawler as Business Operations Manager for CSS. (Complaint, ¶ 14.) Lawler reported to and was under the supervision of Plaintiff. *Id.* On December 6, 2021, Defendant hired Calen Bowshier as Administrator for Perioperative Services, and he became Plaintiff's direct supervisor at that time. (Bowshier Affidavit, ¶ 4.) It is undisputed that in August 2022, Bowshier gave Plaintiff a less favorable performance evaluation than she had received in the past from Rahmanian, and on October 11, 2022, Defendant placed Plaintiff on a Performance Improvement Plan (PIP). There is no dispute that Defendant terminated Plaintiff's employment as Director of CSS on October 27, 2022, and rather than appointing anyone to the position of Director of CSS, Defendant subsequently promoted Lawler, a male, who was 33, to Interim Director of Business Operations for CSS, and promoted Jennifer Baughman, a woman, who was 40, to Interim Associate Director of Clinical Operations for CSS (Lawler Deposition, p. 15; Baughman Deposition, p. 35.)

{¶9} On April 6, 2023, Plaintiff commenced this action asserting claims of age discrimination under the federal Age Discrimination in Employment Act (ADEA), 29 U.S.C. 620, et seq., and R.C. 4112.14, as well as sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, and R.C. 4112.02.

**Law and Analysis**

{¶10} "The ADEA prohibits an employer from discharging an individual 'because of such individual's age.' 29 U.S.C. § 623(a)(1). Section 4112.14 of the Ohio Revised Code provides that no employer shall 'discharge without just cause any employee aged forty or older who is physically able to perform the duties and otherwise meets the established requirements of the job.'" *Blizzard v. Marion Tech. College*, 698 F.3d 275, 282-283 (6th Cir. 2012), quoting R.C. 4112.14(A). "Age discrimination claims brought under the Ohio statute are 'analyzed under the same standards as federal claims brought under the [ADEA].'" *Id.* at 283, quoting *Wharton v. Gorman-Rupp Co.*, 309 F. Appx. 990, 995 (6th Cir. 2009).

{¶11} "Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against any employee with respect to her terms, conditions, or privileges of employment, because of the employee's sex. 42 U.S.C. § 2000e-2(a)(1)." *Million v. Warren Cty.*, 440 F.Supp.3d 859, 869 (S.D.Ohio 2020).

{¶12} Similarly, R.C. 4112.02 provides, in pertinent part, that:

It shall be an unlawful discriminatory practice: (A) For any employer, because of the . . . sex . . . of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any other matter directly or indirectly related to employment.

In Ohio, "federal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000(e) et seq., Title 42, U.S. Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Little Forest Med. Ctr. v. Ohio Civil Rights Comm.*, 61 Ohio St.3d 607, 609-610 (1991); *see also Laderach v. U-Haul*, 207 F.3d 825, 828 (6th Cir. 2000) ("the elements and legal standards for establishing unlawful sex discrimination are the same under Ohio Rev. Code § 4112.02 and under 42 U.S.C. § 2000e-2").

{¶13} "'To prevail in an employment discrimination case, a plaintiff must prove discriminatory intent' and may establish such intent through either direct or indirect methods of proof." *Dautartas v. Abbott Labs.*, 2012-Ohio-1709, ¶ 25 (10th Dist.), quoting *Ricker v. John Deere Ins. Co.*, 133 Ohio App.3d 759, 766 (10th Dist. 1998).

{¶14} "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir.1999). Direct evidence "does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003). In order for a statement to be evidence of an unlawful employment decision, plaintiff must show a nexus between the improper motive and the decision making process or personnel. *Birch v. Cuyahoga Cty. Probate Court.*, 2007-Ohio-6189, ¶ 23 (8th Dist.). "Accordingly, courts consider: (1) whether the comments were made by a decision maker; (2) whether the comments were related to the decision making process; (3) whether they were more than vague, isolated or ambiguous; and (4) whether they were proximate in time to the act of alleged discrimination." *Id.* "[S]tray remarks, remarks by non-decision makers, comments that are vague, ambiguous, or isolated, and comments that are not proximate in time to the act of termination" do not constitute direct evidence. *Johnson v. Kroger Co.,* 160 F. Supp.2d 846, 853 (S.D.Ohio 2001), rev'd on other grounds, 319 F.3d 858 (6th Cir. 2003).

{¶15} Plaintiff does not argue that there is direct evidence of age or sex discrimination in this case. Rather, Plaintiff asserts that her claims of unlawful discrimination on the basis of age and sex can be demonstrated through the indirect method of proof. (Response, p. 16.) *See Geller v. Henry Cty. Bd. of Ed.*, 613 Fed.Appx. 494, 499 (6th Cir. 2015) ("Geller does not argue that he has direct evidence of age discrimination. Accordingly, his case is reviewed under the standard for circumstantial evidence.").

{¶16} Establishing discriminatory intent through the indirect method of proof is subject to the burden shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Nist v. Nexeo Solutions, LLC*, 2015-Ohio-3363, ¶ 31 (10th Dist.). In addition to applying the *McDonnell Douglas* framework to discrimination claims under Title VII, "Federal courts also have adapted the *McDonnell Douglas Corp.* framework to claims brought under the Age Discrimination in Employment Act of 1967

("ADEA"), 81 Stat. 602, as amended, Section 621 et seq., Title 29, U.S.Code." *Coryell v. Bank One Trust Co. N.A.*, 2004-Ohio-723, ¶ 10.

{¶17} "Under *McDonnell Douglas*, a plaintiff must first present evidence from which a reasonable [trier of fact] could conclude that there exists a prima facie case of discrimination." *Turner v. Shahed Ents.*, 2011-Ohio-4654, ¶ 12 (10th Dist.). "In order to establish a prima facie case, a plaintiff must demonstrate that he or she: (1) was a member of the statutorily protected class, (2) suffered an adverse employment action, (3) was qualified for the position, and (4) was replaced by a person outside the protected class or that the employer treated a similarly situated, non-protected person more favorably." *Nelson v. Univ. of Cincinnati*, 2017-Ohio-514, ¶ 33 (10th Dist.). "If the plaintiff meets her initial burden, the burden then shifts to the defendant to offer 'evidence of a legitimate, nondiscriminatory reason for' the adverse action . . . . If the defendant meets its burden, the burden then shifts back to the plaintiff to demonstrate that the defendant's proffered reason was actually a pretext for unlawful discrimination." *Turner* at ¶ 14.

{¶18} Defendant argues that Plaintiff cannot satisfy the fourth prong of the *McDonnell Douglas* framework, since, according to Defendant, Plaintiff was not replaced. Rather, Defendant argues that Plaintiff's job duties were redistributed between Lawler and Baughman. (Motion, p. 12.) In response, Plaintiff points to case law establishing that replacement can be shown even when duties are split among existing employees. (Response, p. 23.) However, Defendant additionally argues that, even if Plaintiff were able to make out a prima face, Defendant is entitled to summary judgment on the basis that Plaintiff cannot present evidence to support a finding that Defendant's reasons for terminating her employment were pretext for discrimination on the basis of age of sex. (Motion, p. 12.)

{¶19} Upon review, the Court need not resolve whether Plaintiff can establish a prima facie case, as Defendant's latter argument is dispositive since Plaintiff does not meet the ultimate burden of demonstrating pretext in this case. *See Tanksley v. Howell*, 2020-Ohio-4278, ¶ 25 (10th Dist.) (finding no need to address plaintiff's prima facie case as plaintiff did not meet the ultimate burden of demonstrating pretext). There is no question of material fact that Defendant had legitimate, nondiscriminatory reasons for

terminating Plaintiff's employment and Plaintiff cannot show that Defendant's proffered reasons were pretext for discrimination on the basis of age or sex. *Id.*

{¶20} Defendant asserts that it terminated Plaintiff's employment based on her "Unsatisfactory Job Performance", as related to Plaintiff in a letter from Defendant's Human Resources department formally notifying Plaintiff of the termination on October 27, 2022. (Jones Deposition, Exhibit H.)

{¶21} There is no dispute that in her most recent annual performance evaluation, in August 2022, Plaintiff was rated lower than she had been in previous evaluations, and received a two percent salary increase indicative of being a "low performer." (Jones Deposition, p. 125.) There is also no dispute that, even if Plaintiff's former supervisor, Rahmanian, had given her more favorable evaluations than did her new supervisor, Bowshier, Plaintiff had been at odds with stakeholders in other departments of Defendant's healthcare system from early on in her tenure and CSS "began to see the operations start to fall apart in May of '21", shortly before Rahmanian resigned. (*Id.* at p. 24.) Defendant submitted an affidavit from Bowshier in which he avers, in part:

> 6.     After Ms. Jones' performance evaluation in August of 2022, I began receiving reports from key stakeholders (surgeons, department leaders, and staff) that CSS was struggling. It concerned me that these other leaders were reporting concerns directly and bypassing Ms. Jones.
>
> 7.     On September 13, 2022, Ms. Jones did not attend a previously-scheduled meeting with OSUWMC HR Consultant Kelly Robertson and me, and did not promptly respond to my attempts to reach her. The meeting was to discuss Senior and Lead OC positions.
>
> 8.     My overarching concern with Ms. Jones' performance was her lack of effective leadership, poor communication, and failure to proactively and strategically address the root causes of recurring issues and ongoing dissatisfaction with CSS from within perioperative services at large and CSS itself.
>
> 9.     To address ongoing performance issues, I placed Ms. Jones on a performance improvement plan ("PIP").

(Bowshier Affidavit, ¶ 6-9.)

{¶22} Bowshier goes on to state that when he met with Plaintiff on October 11, 2022, to discuss the need for the PIP, Plaintiff "did not take any accountability for the failures in her department", and instead blamed others and expressed disbelief that Bowshier had received complaints from stakeholders. (*Id.* at ¶ 10; Exhibit A.) Bowshier avers that, following the implementation of the PIP, he "continued to receive complaints and concerns about performance issues with CSS", and he kept a detailed log of these communications. (*Id.* at ¶ 12.) For example, among other things, Bowshier noted instances of perioperative leadership bypassing Plaintiff to report issues such as contaminated surgical instruments directly to him, Plaintiff failing to notify him of staff leaving CSS, and negative feedback he received directly from CSS staff. (Bowshier Affidavit, Exhibit B, p. 3.)

{¶23} In addition to these concerns, Bowshier avers, "CSS was experiencing high turnover rate among managers, supervisors, and frontline staff" and in his view Plaintiff "did not demonstrate that she would address concerns with her performance, including her lack of effective leadership, poor communication, and failure to proactively and strategically address the root causes of recurring issues and ongoing dissatisfaction with CSS from within perioperative services at large and CSS itself." (Bowshier Affidavit, ¶ 13-14.)

{¶24} Bowshier states in his affidavit that "[a]s a result of the compounding problems at CSS and high turnover rate under Ms. Jones' directorship, I recommended she be terminated." (Bowshier Affidavit, ¶ 16.) In a letter to the human resources department formally requesting that Plaintiff's employment be terminated, Bowshier gave a detailed explanation as to why he felt Plaintiff fell below expectations in several areas, including her relationship management with the Supply Chain and Hospital Pavilion Perioperative departments; her execution of projects and initiatives; not sharing information with leadership and staff; not sharing information with Bowshier about leadership changes in CSS including the loss of managers, supervisors, and frontline staff; not escalating key issues to Bowshier; not proactively addressing department challenges; and, Bowshier also noted negative feedback and concerns he received from key stakeholders, as well as his belief that Plaintiff was not addressing the focus areas in

her PIP confidentially.  (Bowshier Affidavit, ¶ 16, Exhibit C.)  It is undisputed that Defendant terminated Plaintiff's employment on October 27, 2022.

{¶25} The Court finds that Defendant has presented evidence that its termination of Plaintiff's employment was for legitimate, non-discriminatory reasons, i.e. unsatisfactory job performance.  *See Brown v. Kelsey-Hayes Co.*, 814 Fed.Appx. 72, 80 (6th Cir. 2020) (poor job performance is a legitimate, nondiscriminatory reason for an adverse employment action); *Brown v. Ohio State Univ.*, 616 F.Supp.2d 740, 751 (S.D.Ohio 2009) ("Reasons such as lack of leadership and management skills, the failure to accept problems within her responsibility . . . and poor communication are legitimate non-discriminatory reasons for an employee's demotion or termination.").  The burden therefore shifts to Plaintiff to demonstrate that there is a genuine issue of material fact as to whether Defendant's proffered reason for terminating her employment was merely pretext for discrimination on the basis of age or sex.

{¶26} To establish pretext, a plaintiff must demonstrate that the proffered reason (1) has no basis in fact, (2) did not actually motivate the employer's challenged conduct, or (3) was insufficient to warrant the challenged conduct.  *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000).  "Regardless of which option is used, the plaintiff retains the ultimate burden of producing 'sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against [her].'" *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003), quoting *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001).  A reason cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)*; see also Knepper v. Ohio State Univ.*, 2011-Ohio-6054, ¶ 12 (10th Dist.).  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

{¶27} In her response, Plaintiff argues that insofar as Bowshier's affidavit in support of the Motion for Summary Judgment identified "three 'overarching' performance reasons for [her] termination", those reasons "are not factual, were not motivat[ion for] Jones' termination, and were insufficient to motivate Jones' termination."  (Response, p.

22.)  Specifically, in his affidavit Bowshier explained that before deciding to put Plaintiff on a PIP, his "overarching concern with [Plaintiff's] performance was her lack of effective leadership, poor communication, and failure to proactively and strategically address the root causes of recurring issues and ongoing dissatisfaction with CSS from within perioperative services at large and CSS itself."  (Bowshier Affidavit, ¶ 8.)

{¶28} According to Plaintiff, her "leadership was not a problem."  (Response, p. 23.)  As evidence, Plaintiff points to an email that a subordinate of hers, Lead Inventory Analyst Tiffanie Winston, wrote to Bowshier and Dennis Delisle in connection with her resignation from CSS, which in Plaintiff's view "detailed the positive changes [Plaintiff] made to CSS and how [Plaintiff] acted as a mentor to her."  (Response, p. 23; Exhibit 9.)  But the statements Plaintiff points to in the email are hearsay when offered for the truth of the matters asserted.  Moreover, the email refers to Winston believing there was "turmoil and sabotage" within CSS and other negative issues, and it was written in connection with Winston leaving CSS, thus corroborating the evidence that Bowshier received reports of CSS being in turmoil and that CSS had a worsening problem with employee turnover.  Plaintiff also points to portions of the depositions of Lawler and Baughman, but Lawler and Baughman simply testified in those portions that they met with Plaintiff regularly or were in regular communication with her during her tenure; this testimony does not contravene the evidence that Bowshier believed Plaintiff's leadership was ineffective.

{¶29} As to Bowshier's concern over "poor communication", Plaintiff points to evidence that she regularly communicated with her subordinates and held meetings with Bowshier and others.  But even if there is some evidence of Plaintiff communicating, this does not contravene Defendant's evidence of *poor* communication on her part.  For example, Bowshier averred that on September 13, 2022, plaintiff failed to attend a previously scheduled meeting with an HR consultant and himself and did not promptly respond to his attempts to reach her.  (Bowshier Affidavit, ¶ 7.)  And in Bowshier's letter requesting to terminate Plaintiff's employment, one of the specific reasons he identified for doing so was that she was increasingly failing to notify him of key issues that he felt she should have communicated to him, such as "CWA employee behavior challenges, increased turnover in staffing, and alcohol/tobacco related complaints filed regarding a

former manager", but Bowshier instead learned of such information from other stakeholders. (Bowshier Affidavit, Exhibit C.) The "[f]ailure to accurately communicate with leadership regarding employee status" was one of the areas of improvement identified in the PIP, yet on October 20, 2022, after the PIP went into effect, Bowshier documented Plaintiff still failing to communicate with him about such matters, including Winston's resignation. (Bowshier Affidavit, Exhibit B.) Bowshier avers that amid this and other documented complaints and issues arising during the pendency of the PIP, it became apparent that Plaintiff would not address his concerns about her poor communication and other issues. (Bowshier Affidavit, ¶ 12-14.) Bowshier related his concerns about communication problems and other issues to the human resources department, and noted his belief that CSS was "declining at a rapid pace", when requesting that Plaintiff be removed before the expiration of the 30-day PIP. *See Reynolds v. Extendicare Health Servs.*, 2006 U.S.Dist. LEXIS 81007, *13-14 (S.D.Ohio Nov. 1, 2006) ("the fact that Reynolds was fired one week before the thirty-day PIP expired . . . does not throw into question Defendants' proffered explanation for her dismissal. The evidence shows Reynolds was working under a PIP because her performance needed improvement, and that she was not progressing.").

{¶30} As to Bowshier's concern that Plaintiff failed "to proactively and strategically address the root causes of recurring issues and ongoing dissatisfaction with CSS from within perioperative services at large and CSS itself", Plaintiff asserts that she "created a three-year strategic plan for CSS" and "also created the REDcap tool to identify and remedy the root cause of contaminated trays in the OR", and that she "identified multiple staffing issues and submitted requests for additional FTEs to address the staffing issue." (Response, pp. 23-24.) But Plaintiff admitted that the three-year strategic plan was Lawler's idea. (Jones Deposition, 72:10-24.) Plaintiff also admitted that it was Dennis Delisle who directed her to hire traveling workers "to stabilize" staffing problems after CSS operations "started to fall apart in May of '21." (Jones Deposition, pp. 24, 62.) And Plaintiff admitted that after she decided to develop the REDcap tool, three years passed, and it was only completed "once Delisle got involved" with it in 2021 amid the deterioration of CSS operations. (Jones Deposition, 66-67.) The evidence cited by Plaintiff does not demonstrate that she proactively and strategically addressed the root causes of recurring

issues and ongoing dissatisfaction with CSS from within perioperative services at large and CSS itself.

{¶31} Plaintiff also argues there is a factual dispute insofar as Bowshier noted in his affidavit and in his letter requesting the termination of her employment that he believed she did not keep her PIP confidential.  Whether or not Plaintiff specifically told others that she was on a PIP, Bowshier noted in his letter requesting the termination that he had had conversations with others which led him to have a genuine belief that Plaintiff was not keeping their PIP discussions confidential, which in his view "erodes trust not only between [Plaintiff] and I, but throughout the entire department."  (Bowshier Affidavit, Exhibit C.)  In response, Plaintiff argues that Bowshier pointed to three statements made by individuals in which none of them explicitly stated that Plaintiff had discussed her PIP with them directly.  (Response, p. 24-25).  However, Plaintiff admittedly told at least one other employee of Defendant that she was on a PIP.  (Jones Deposition, p. 153.)  Regardless, Plaintiff's argument does not identify evidence that creates a factual dispute as to whether Bowshier's honest belief was that Plaintiff was discussing her PIP with other employees, and that this was creating discord in the organization.  *See Wigglesworth v. Mettler Toledo Intl., Inc.*, 2010-Ohio-1019, ¶ 19 (10th Dist.).

{¶32} Plaintiff also argues that pretext is shown because Lawler and Baughman replaced her and have "engaged in the *exact* same conduct".  (Emphasis original.) (Response, p. 14.)  Specifically, according to Plaintiff, after her termination "CSS did not change and [key performance indicators] did not decrease."  (Response, p. 14.)  But the issue is not whether Plaintiff's termination improved the performance metrics of CSS or was otherwise a sound business decision, it is whether her termination was based on age or sex.  *See Lawroski v. Nationwide Mut. Ins. Co.*, 981 F.Supp.2d 704, 714 (S.D.Ohio 2013).  Nor does Plaintiff point to evidence that Lawler or Baughman have engaged in substantially the same conduct that Bowshier explained in detail to have led him to recommend terminating Plaintiff's employment; for example, failing to notify him of key issues that should have been communicated to him.

{¶33} Finally, Plaintiff argues that "Bowshier deemed [her] processes 'archaic'" and that this constituted "a jab at her age because he was constantly asking her to come up with innovative methods for CSS . . . ."  (Response, p. 26.)  But Plaintiff does not point to

any evidence that Bowshier or others involved in the decision to terminate her employment, or anyone specifically, ever used the word 'archaic', nor that the word was used in connection with her termination or close in time to her termination. Rather, Plaintiff cites deposition testimony in which she stated that some unidentified person or persons at some point during her tenure with Defendant used the word 'archaic' to describe some of the recordkeeping practices previously used in CSS. (Jones Deposition, 168:5-14.) Earlier in her deposition, however, Plaintiff herself described such practices, including one that involved "collect[ing] volumes of paper", as indeed being "archaic". (Jones Deposition, 156:1-3.) The vague evidence that Plaintiff points to about the use of this word is ambiguous at best, has little probative value, and does not suggest an age-based animus. *See Brehm v. MacIntosh Co.*, 2019-Ohio-5322, ¶ 32 (10th Dist.), quoting *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025 (6th Cir. 1993), quoting *Gagne v. Northwestern Natl. Ins. Co.*, 881 F.2d 309, 314 (6th Cir. 1989) ("'[i]solated and ambiguous comments "are too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination."'").

{¶34} In viewing the facts in a light most favorable to Plaintiff, the Court finds that Plaintiff has failed to identify a genuine issue of material fact for trial. Defendant met its burden of proffering evidence that its termination of Plaintiff's employment was for legitimate, non-discriminatory reasons, i.e. unsatisfactory job performance. Defendant put forward evidence that there was a genuine belief on the part of Bowshier that Plaintiff's leadership and communication were poor, that Plaintiff was not addressing the root causes of recurring issues at CSS, that the high staff turnover and other problems at CSS were compounding, and that Plaintiff did not demonstrate that she would address Bowshier's concerns with her performance. Plaintiff did not meet her reciprocal burden of coming forward with evidence that Defendant's proffered reasons for terminating her employment were pretextual, and that discrimination on the basis of age or sex was the real reason. Accordingly, reasonable minds can therefore only conclude that Plaintiff cannot prevail on her claims of employment discrimination.

**Conclusion**

{¶35} Based upon the foregoing, the Court concludes that there are no genuine issues of material fact, and that Defendant is entitled to judgment as a matter of law. Therefore, Defendant's Motion for Summary Judgment shall be GRANTED.


LISA L. SADLER
Judge

[Cite as *Jones v. Ohio State Univ. Wexner Med. Ctr.*, 2025-Ohio-517.]

| | |
|---|---|
| KIMBERLY JONES | Case No. 2023-00266JD |
| Plaintiff | Judge Lisa L. Sadler |
| | Magistrate Robert Van Schoyck |
| v. | |
| | <u>JUDGMENT ENTRY</u> |
| THE OHIO STATE UNIVERSITY WEXNER MEDICAL CENTER | |
| Defendant | |

## IN THE COURT OF CLAIMS OF OHIO

**{¶36}** A non-oral hearing was conducted in this case upon Defendant's Motion for Summary Judgment. For the reasons set forth in the Decision filed concurrently herewith, Defendant's Motion for Summary Judgment is GRANTED. Judgment is rendered in favor of Defendant. All previously scheduled events are VACATED. Court costs are assessed against Plaintiff. The Clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

LISA L. SADLER
Judge

**Filed January 29, 2025**
**Sent to S.C. Reporter 2/18/25**