[Cite as *Nelson v. Univ. of Cincinnati*, 2017-Ohio-514.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| John Russell Nelson, | : | |
| Plaintiff-Appellant, | : | |
| | | No. 16AP-224 |
| v. | : | (Ct. of Cl. No. 2014-00830) |
| University of Cincinnati, | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on February 14, 2017

**On brief:** *Tobias, Torchia & Simon*, and *David Torchia*, for appellant. **Argued:** *David Torchia*.

**On brief:** *Michael DeWine*, Attorney General, *Eric A. Walker*, and *Lindsey M. Grant*, for appellee. **Argued:** *Eric A. Walker*.

APPEAL from the Court of Claims of Ohio

DORRIAN, J.

{¶ 1} Plaintiff-appellant, John Russell Nelson, appeals the February 22, 2016 decision and judgment entry of the Court of Claims of Ohio rendering judgment following a bench trial in favor of defendant-appellee, University of Cincinnati ("appellee" or "the university"). For the following reasons, we affirm.

I. Facts and Procedural History

{¶ 2} In 2009, the university formed a search committee for the position of Assistant Dean of Administrative Services at Clermont College ("the college"), which is one of the university's regional colleges.[1] The position's responsibilities included managing administrative and fiscal operations on behalf of the college. Following the

---

[1] University officials also referred to this position as a "business administrator." (Tr. Vol. I at 84.)

suggestion of Jim McDonough, the college's interim dean, appellant, an African-American male, applied for the position and was interviewed by the search committee.

{¶ 3} Kathleen Qualls, the senior vice provost for academic finance and administration for the university, served on the search committee. Qualls testified that all the applicants other than appellant were Caucasian. Qualls alone disagreed with the other members of the committee that appellant met the minimum qualifications for the position. Despite Qualls' disagreement, the committee recommended appellant to McDonough. McDonough interviewed appellant and then hired him for the position.

{¶ 4} On October 12, 2009, appellant began his employment with the university as an unclassified or at-will employee. Appellant had a "solid line" reporting relationship with McDonough, meaning that McDonough served as appellant's direct supervisor. (Tr. Vol. II at 325.) Appellant also had a "dotted-line" reporting relationship with Qualls. (Tr. Vol. II at 325-26.) Qualls stated that "[a] dotted-line reporting relationship exists when you want to facilitate the flow of information." (Tr. Vol. II at 328.) In 2010, Gregory Sojka replaced McDonough as dean of the college and served as appellant's direct supervisor. Appellant continued to have a dotted-line reporting relationship with Qualls.

{¶ 5} Appellant testified that he periodically contacted the Ohio Board of Regents ("OBR") for various matters related to his job duties. David Cannon, vice chancellor of finance and data management at OBR, testified that OBR is a coordinating body for higher education for the state of Ohio, responsible for making sure that colleges and universities meet academic standards as well as administering financial resources from the state. According to appellant, Jan Diegmueller, who was responsible for budgets at the university's main campus, told appellant that Katie Hensel, a vice chancellor of finance, would be his contact at OBR.

{¶ 6} Appellant testified that in 2012, the college used $800,000 from its contingency fund in order to balance its general fund due to declining enrollment. As a result, appellant wanted to develop metrics and put internal controls in place. In September 2012, appellant told Sojka that he was going to call OBR for information in order to calculate metrics. Appellant attempted to call Hensel, but was unable to reach her. After looking through a staff directory, appellant called Cannon. Appellant had not previously spoken with Cannon, although he was able to determine Cannon's job title based on the OBR staff directory.

{¶ 7} Sojka testified that he did not recall appellant telling him that he was planning to contact OBR. Sojka admitted that contacting OBR was "something that [appellant] could do" and that appellant had a regular contact at OBR, though he did not know the person's name. (Tr. Vol. I at 43.)

{¶ 8} According to appellant, he informed Cannon that the college was using its reserves to balance its general fund, which was something the college had never before done. Cannon stated that he would send appellant an Excel template to help with appellant's metrics. Appellant testified that during his call with Cannon, he received an e-mail from Jeffrey Bauer, chair of the business law technology department at the college, which was sent to both Sojka and appellant. After skimming the e-mail and noticing that it mentioned changes to the funding model between the regional colleges and the university's main campus, appellant asked Cannon whether the state's subsidy to the college could be adjusted without OBR making the change. Cannon replied that OBR would eventually make changes in how the subsidy would be calculated but that he could not tell appellant when that would occur.

{¶ 9} The record reflects that on September 13, 2012, Bauer sent Sojka and appellant an e-mail with the subject "Budget Yikes/Interim Provost Comments" in which Bauer discussed comments made by Larry Johnson, the university's interim provost. (Appellant's Ex. 4, 6.) Specifically, Bauer mentioned Johnson's discussion of funding changes between the regional colleges and the university's main campus. On September 14, 2012, appellant replied to Bauer and Sojka as follows:

> Thanks for the "heads-up". The Regional campuses [sic] economic house is in order and we charge the least amount of tuition than anyone in the system. The problem is not the "Regional colleges", it is the way the University has managed its business over the years. We are not designed to "bail" them out of their financial problems. Clermont has the largest cash reserves than any of the colleges within the University. We did not get there by being big spenders, we got there by being responsible stewards of our financial resources.
>
> We are separately accredited and we have a separate mission. It is time to put on some boxing gloves.
>
> We better get our political alliances in order within the greater community because I see a dog fight coming. We will need Legislative support if it comes down to it.

(Appellant's Ex. 4.)    Appellant forwarded the above e-mail to Andrew Kuchta, the economic development director for Clermont County.  On September 17, 2012, Sojka sent appellant a response to the aforementioned e-mails stating: "Please wait about sharing this preliminary news with any advocates outside the College.  Not sure how all this will turn out. Private meeting with [Johnson] on Wed."  (Appellee's Ex. D.)

{¶ 10} Additionally, on September 14, 2012, Sojka wrote to appellant in response to Bauer's e-mail.  Appellant replied to Sojka and stated in part that "I will update you on a brief conversation I had with an OBR representative today on this email from [Bauer]. A very interesting perspective."  (Appellant's Ex. 6.)  On September 17, 2012, Sojka replied to appellant asking to schedule a meeting with him.  On September 18, 2012, appellant replied and stated that he would plan on meeting with Sojka that day.

{¶ 11} Cannon testified that because of the timing of the call in relation to upcoming changes in funding for the university, he wanted to inform someone at the university that appellant had called him.  Cannon believed that it was an "unusual call" but also said that he "had no problem with the call."  (Tr. Vol. II at 288; 285.)  Cannon testified that he did not recall whether appellant asked him to intervene regarding the distribution of funds from the college to the university.  Cannon discussed the call with Lana Reubel, OBR's chief of staff, who contacted Margaret Rolf, assistant vice president for government relations at the university.  Rolf then called Cannon.

{¶ 12} According to Rolf, Cannon described the call as the "most unusual and bizarre call" he had ever received.  (Tr. Vol. I at 108.)  Additionally, Cannon told Rolf that appellant alleged financial improprieties occurring at the university.  Rolf then contacted Robert Ambach, senior vice president for administration and finance at the university.

{¶ 13} Ambach testified that Rolf told him that Cannon was surprised to have been contacted by appellant. Ambach himself was surprised and found it unusual that appellant had contacted Cannon because he "perceive[d] that as going almost over four layers of administration."  (Ambach Depo. at 11.)  Although Ambach testified there could have been some situation where it would have been appropriate for a person in appellant's position to contact Cannon, he also felt that it was unusual for such a call to take place without being "vetted within the University previously."  (Ambach Depo. at 13.)  Ambach briefly told Qualls that appellant called OBR and instructed Qualls to contact Rolf for more details.  Qualls called Rolf, who described her conversation with Cannon.

{¶ 14} Ambach also informed Johnson regarding appellant's call. Johnson, who was also Sojka's direct supervisor, discussed the matter with Qualls. Qualls reported to Johnson that she had discussed the matter with Rolf. Johnson then asked Qualls to send him an e-mail detailing the contents of her conversation with Rolf. On September 21, 2012, Qualls sent an e-mail to Johnson which stated as follows:

> On Thursday morning I had a conversation with [Ambach] and he shared some concerns about [appellant] and told me that he asked [Rolf] to call me. I had the following phone conversation with [Rolf] at 9:20 am on Thursday, Sept 20, 2012.
>
> [Appellant] (BA from Clermont) called [Cannon], Deputy Chancellor for Finance at [OBR].
>
> [Appellant] told [Cannon] that he wanted [OBR] to intervene — Clermont is sitting on some reserves and [appellant] is worried that [the university] is going to take away his reserves. He does want that to happen [sic]. [Appellant] asked if Senate Bill 6 rations [could] be invoked.
>
> Senate Bill 6 is a set of metrics put in place when Central State went belly up and includes things like debt ratios, bond ratings, expected ability to pay.
>
> These rations apply to the overall university and not to a single college. It just doesn't make sense. [Cannon] told [Rolf] that this was one of the most bizarre conversations he had ever had. [Cannon] also said that he asked [appellant] if he ran this by his Dean. [Appellant] replied that he had but his dean didn't bite so he thought he would take it up the ladder.

(Appellant's Ex. 7.)

{¶ 15} On September 21, 2012, Johnson then e-mailed Sojka, attaching Qualls' above e-mail to the message, and stating the following:

> I am VERY concerned about the e-mail below and I indicated to [Ambach] and others that I was sure you did not know about this and that I would get your perspective before we act. Long story short, people are very upset and asking how this could happen. If this set of circumstances are [sic] true, the university looked VERY foolish and it appears like we are not adequately supervising our staff. Did your business officer really go over your head and talk to somebody at OBR to try [to] intervene on concerns that are based on rumors! If this is true, it is a grave transgression that speaks volumes about

your business officer['s] lack of respect for you and the university that needs serious action — let's talk!

(Emphasis sic.)  (Appellant's Ex. 7.)  Johnson stated that he did not directly speak with either Cannon or appellant about the call.  Qualls also did not directly speak to appellant about the call.

{¶ 16} On September 24, 2012, Sojka sent Johnson's e-mail to appellant and instructed appellant to set an appointment with Sojka's administrative assistant to discuss the matter.  According to appellant, he met with Sojka on the same day.  At the meeting, Sojka said that he informed Johnson that he was aware of appellant's call to OBR. Appellant denied making any inappropriate statements on his call to OBR and disputed the account in Qualls' e-mail.  Furthermore, appellant requested a meeting with the other university officials who were accusing him of making inappropriate statements.  Appellant stated that Sojka's administrative assistant scheduled the meeting for September 25, 2012, but then informed appellant that the meeting had been cancelled.  At trial, Sojka was unable to remember whether he met with appellant on September 24, 2012.

{¶ 17} According to Johnson, Sojka stated he was unaware that appellant was going to make the call to OBR.  Specifically, Johnson stated that Sojka "told me he called and talked to [appellant] and that [appellant] had admitted that he made the call, and [Sojka] assured me he had nothing to do with it."  (Tr. Vol. I at 99.)  Johnson testified that if Sojka was aware of and approved appellant's call to OBR, it "would have been a serious problem."  (Tr. Vol. I at 73.)

{¶ 18} At trial, Sojka stated that he was told by Johnson to terminate appellant's employment and that there were no other options.  Johnson denied telling Sojka to terminate appellant's employment, but, rather, told Sojka to employ progressive discipline to improve appellant's performance.

{¶ 19} On October 19, 2012, Sojka met with appellant and informed him that he was being terminated without cause.  Appellant asked why he was being terminated. Sojka replied only that the college was "going in a different direction" and did not mention appellant's call to OBR or any other reason.  (Tr. Vol. I at 35.)  Sojka presented appellant with a termination letter which appellant refused to sign.

{¶ 20} Approximately sometime in January 2013, Sojka hired Mick McLaughlin, a former assistant dean for financial affairs, to work part-time on a temporary basis until the university completed a search for a permanent replacement for appellant.

{¶ 21} Sojka testified that, following appellant's termination, the university determined the title of "assistant dean" would no longer be applied to persons working in a non-academic capacity. (Tr. Vol. II at 402.) Thus, the job title for appellant's former position was changed to "director of business affairs." (Tr. Vol. II at 404.) After Sojka established the job title and duties for the position, he formed a search committee to evaluate the applications.

{¶ 22} Following a search, Maria Keri, a Caucasian woman, was hired as the new director of business affairs. Sojka testified that, based on his decision, Keri's position included two additional job duties which appellant did not perform. First, Keri was responsible for managing human resources functions for both faculty and staff, whereas appellant was responsible for only staff. This additional responsibility also included the hiring and supervision of a new staff member who reported to Keri. Sojka estimated that Keri spent between 25 and 45 percent of her time on this job duty. Second, Keri was responsible for creating a program cost study. Sojka testified that Keri spent up to 25 percent of her time on this job duty.

{¶ 23} On October 16, 2014, appellant filed a complaint alleging claims of race and gender discrimination. On January 30, 2015, appellee filed an answer denying appellant's claims.

{¶ 24} On September 11, 2015, appellee filed a motion for summary judgment. On September 25, 2015, appellant filed a memorandum in opposition to appellee's motion for summary judgment. On October 2, 2015, appellee filed a motion for leave to reply to appellant's September 25, 2015 memorandum. On November 30, 2015, the Court of Claims filed an entry granting appellee's October 2, 2015 motion for leave to reply and denying appellee's September 11, 2015 motion for summary judgment.

{¶ 25} On December 14, 2015, the matter proceeded to a bench trial. On December 24, 2015, appellant filed a post-trial brief; on December 28, 2015, appellee filed a post-trial brief. On February 22, 2016, the Court of Claims filed a decision and judgment entry rendering judgment in favor of appellee.

## II. Assignment of Error

{¶ 26} Appellant appeals and assigns the following single assignment of error for our review:

> THE TRIAL COURT ERRED BY ENTERING JUDGMENT
> FOR THE DEFENDANT.

## III. Discussion

{¶ 27} In his single assignment of error, appellant asserts the Court of Claims' judgment was against the manifest weight of the evidence. Specifically, appellant contends the Court of Claims erred in finding that (1) appellant failed to prove a prima facie case of employment discrimination, and (2) appellant failed to prove that the reasons offered in support of his termination were pretextual.

### A. Standard of Review

{¶ 28} " 'Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends on its effect in inducing belief." ' " (Emphasis omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting Black's Law Dictionary 1594 (6th Ed.1990).

{¶ 29} " 'Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.' " *Rosenshine v. Med. College Hosps.*, 10th Dist. No. 11AP-374, 2012-Ohio-2864, ¶ 9, quoting *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 280 (1978). "Under the civil [manifest-weight-of-the-evidence] standard, examining the evidence underlying the trial judge's decision is a prerequisite to determining whether the trial court's judgment is supported by some competent, credible evidence." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 40. *See also Eastley* at ¶ 15 ("The phrase 'some competent, credible evidence' * * * presupposes evidentiary weighing by an appellate court to determine whether the evidence is competent and credible."). Accordingly, a reviewing court must weigh the evidence presented in the trial court.

{¶ 30} However, in weighing the evidence, we are mindful of the presumption in favor of the finder of fact. *Id.* at ¶ 21; *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d

77, 80 (1984) (noting that a reviewing court gives deference to the finder of fact because "the [finder of fact] is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony"). " ' "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." ' " *Eastley* at ¶ 21, quoting *Seasons Coal* at 80, fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-92 (1978). "Thus, in reviewing a judgment under the manifest-weight standard, a court of appeals weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way." *Sparre v. Ohio Dept. of Transp.*, 10th Dist. No. 12AP-381, 2013-Ohio-4153, ¶ 10, citing *Eastley* at ¶ 20.

## B. Applicable Law

{¶ 31} R.C. 4112.02 prohibits employment discrimination based on race and sex. Specifically, R.C. 4112.02(A) provides that "[i]t shall be an unlawful discriminatory practice * * * [f]or any employer, because of the race, color, religion, sex, military status, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." R.C. 4112.99 authorizes civil actions for any violations of R.C. Chapter 4112. Generally, Ohio courts examine state employment discrimination claims under the guidance of federal anti-discrimination case law. *Coryell v. Bank One Trust Co. N.A.*, 101 Ohio St.3d 175, 2004-Ohio-723, ¶ 15. *But see Williams v. Akron*, 107 Ohio St.3d 203, 2005-Ohio-6268, ¶ 31.

{¶ 32} In order to prevail in an employment discrimination case, a plaintiff must prove discriminatory intent and may establish such intent through either direct or indirect methods of proof. *Ricker v. John Deere Ins. Co.*, 133 Ohio App.3d 759, 766 (10th Dist.1998), citing *Mauzy v. Kelly Servs., Inc.*, 75 Ohio St.3d 578, 583 (1996); *USPS Bd. of Governors v. Aikens*, 460 U.S. 711, 714 (1983), fn. 3. "[A] plaintiff may establish a prima facie case of age discrimination directly by presenting evidence, of any nature, to show that an employer more likely than not was motivated by discriminatory intent." *Mauzy* at paragraph one of the syllabus. Absent direct evidence of discrimination, a plaintiff may

indirectly establish discriminatory intent using the analysis promulgated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), first adopted by the Supreme Court of Ohio in a race discrimination case in *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civil Rights Comm.*, 66 Ohio St.2d 192, 197 (1981). *See Barker v. Scovill, Inc.,* 6 Ohio St.3d 146, 147 (1983) (adopting the *McDonnell Douglas* framework in the context of claims of age discrimination). Here, because appellant relies on indirect proof, we employ the *McDonnell Douglas* burden-shifting analysis.

### 1. Prima Facie Case

{¶ 33} In order to establish a prima facie case, a plaintiff must demonstrate that he or she: (1) was a member of the statutorily protected class, (2) suffered an adverse employment action, (3) was qualified for the position, and (4) was replaced by a person outside the protected class or that the employer treated a similarly situated, non-protected person more favorably. *Wasserstrom v. Battelle Mem. Inst.*, 10th Dist. No. 15AP-849, 2016-Ohio-7943, ¶ 16; *Hall v. Ohio State Univ. College of Humanities*, 10th Dist. No. 11AP-1068, 2012-Ohio-5036, ¶ 15. "[T]he elements of the prima facie case must remain flexible so that they can conform to the facts of the case." *Williams* at ¶ 10, citing *McDonnell Douglas* at 802, fn. 13. Establishing a prima facie case " 'creates a presumption that the employer unlawfully discriminated against the employee.' " *Id.* at ¶ 11, quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

### 2. Employer's Burden of Production

{¶ 34} If a plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate some legitimate, non-discriminatory reason for discharging the employee. *Bowditch v. Mettler Toledo Internatl., Inc.*, 10th Dist. No. 12AP-776, 2013-Ohio-4206, ¶ 16; *Williams* at ¶ 12, citing *Burdine* at 254. The employer meets its burden of production by submitting admissible evidence that " '*taken as true, would permit* the conclusion that there was a nondiscriminatory reason for the adverse action,' " and in doing so rebuts the presumption of discrimination that the prima facie case establishes. (Emphasis sic.) *Williams* at ¶ 12, quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993).

### 3. Pretext

{¶ 35} Finally, if the employer meets its burden of production, a plaintiff must prove by a preponderance of the evidence that the employer's legitimate, non-

discriminatory reasons were merely a pretext for unlawful discrimination. *Bowditch* at ¶ 17, citing *Barker* at 148. Generally, courts have found that a plaintiff establishes pretext by proving one or more of the following: (1) that the employer's proffered reasons for the adverse employment action had no basis in fact, (2) that the proffered reasons were not the true reason(s), or (3) that the proffered reason(s) were insufficient to motivate discharge. *See, e.g.*, *Mittler v. OhioHealth Corp.*, 10th Dist. No. 12AP-119, 2013-Ohio-1634, ¶ 44; *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir.2003); *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994), *abrogated on other grounds*[2] by *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009), as recognized in *Geiger v. Tower Automotive*, 579 F.3d 614, 621 (6th Cir.2009). Although the presumption created by the prima facie case disappears once the employer meets its burden of production, "the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom * * * on the issue of whether the defendant's explanation is pretextual.' " *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000), quoting *Burdine* at 255, fn. 10.

### 4. Finding of Discrimination

{¶ 36} The ultimate burden of persuasion remains at all times with the plaintiff. *St. Mary's Honor* at 511; *Mittler* at ¶ 22. "A case that reaches this point is decided by the trier of fact on the ultimate issue of whether the defendant discriminated against the plaintiff." *Williams* at ¶ 14. In *St. Mary's Honor*, the Supreme Court of the United States stated:

> We have no authority to impose liability upon an employer for alleged discriminatory employment practices unless an appropriate factfinder determines, according to proper procedures, *that the employer has unlawfully discriminated.* We may, according to traditional practice, establish certain modes and orders of proof, including an initial rebuttable presumption of the sort we described earlier in this opinion, which we believe *McDonnell Douglas* represents. But nothing in law would permit us to substitute for the required finding that the employer's action was the product of unlawful discrimination, the much different (and much lesser) finding that the employer's explanation of its action was not believable.

(Emphasis sic.) *Id.* at 514-15. In *Reeves*, the Supreme Court of the United States elaborated:

---

[2] As noted in *Rhoades v. Std. Parking Corp.*, 559 F.Appx. 500, 502 (6th Cir.2014).

> [A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.
>
> This is not to say that such a showing by the plaintiff will *always* be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.

(Emphasis sic.) *Id.* at 148. Thus, " 'a reason cannot be proved to be "a pretext *for discrimination*" unless' " the plaintiff demonstrates " '*both* that the reason was false, *and* that discrimination was the real reason.' " (Emphasis sic.) *Williams* at ¶ 14, quoting *St. Mary's Honor* at 515. *See also Hall* at ¶ 35.

## C. Application

{¶ 37} First, appellant contends the Court of Claims erred in finding that he failed to establish a prima facie case. Specifically, appellant contends that Keri replaced appellant, thereby establishing the fourth prong of appellant's prima facie case. Appellant also contends it was inappropriate for the court to find that appellant failed to establish his prima facie case following trial. We need not address appellant's arguments with regard to his prima facie case because, even if we were to accept that appellant established a prima facie case, we nevertheless find that appellant failed to carry his ultimate burden of demonstrating that discrimination was the real reason for his termination.[3]

{¶ 38} Next, we examine whether appellee met its burden of production by providing a legitimate, non-discriminatory reason for the adverse action. Appellee, in its post-trial brief, asserted it terminated appellant because he "acted inappropriately, unprofessionally, and without any authorization in making a 'bizarre,' 'unusual,' and 'awkward' phone call to [Cannon] and requesting intervention to prevent [the university] from taking [the college's] funds." (Appellee's Post-Trial Brief at 8.) The Court of Claims found that appellee articulated a legitimate, non-discriminatory reason for appellant's

---

[3] We note appellant's argument that "[a]fter a trial on the merits of a discrimination claim, the question of whether a prima facie case has been established is moot unless the defendant has properly preserved the issue for appeal by renewing the motion for a directed verdict at the close of all the evidence." (Emphasis omitted.) (Appellant's Brief at 19.) It is unnecessary for us to address appellant's arguments for the aforementioned reasons.

termination. We find that competent, credible evidence supports the court's finding that appellee met its burden of articulating a legitimate, non-discriminatory reason for appellant's termination.

{¶ 39} Next, we examine whether appellant established that appellee's legitimate, non-discriminatory reason was pretext. The Court of Claims concluded that appellant was "terminat[ed] * * * for making the call to Cannon and not for any discriminatory reason." (Decision at 6.) Additionally, the court found that appellant's "call [to Cannon] was unauthorized and inappropriate, and regardless of the content of the call or whether the information was conveyed incorrectly, [appellant] has failed to show that [appellee's] articulated reason for his termination was merely pretext." (Decision at 6-7.)

{¶ 40} On appeal, appellant asserts four arguments that appellee's reason for terminating his employment was pretext: (1) appellant's conduct in making the call to OBR was not sufficient to justify his termination, (2) appellant did not circumvent the chain of command, (3) Cannon recalled sufficient details of the call to prove that appellee's arguments were pretextual, and (4) any honest belief asserted by appellee was unsupported. As a result, appellant contends the Court of Claims' decision was not supported by competent, credible evidence and was against the manifest weight of the evidence.

{¶ 41} Here, the record reflects that Sojka was aware of appellant's regular contact with a representative of OBR, although Sojka did not know specifically to whom appellant spoke. However, despite Sojka's awareness of appellant's regular contact with OBR, there is competent, credible evidence in the record that neither Sojka nor anyone else at the university approved of appellant's contact with Cannon or the contents of that conversation.

{¶ 42} Appellant stated that Diegmueller instructed him to contact Hensel at OBR. Appellant admitted that he did not seek any authorization to contact Cannon, but, instead, simply searched for his contact information in a staff directory. Furthermore, although appellant disputed the account of his conversation with Cannon as portrayed in Qualls' e-mail, appellant admitted that he brought up the issue of the college's funding with Cannon and also discussed the university's subsidy. Appellant testified that while he was on the call with Cannon, he received and read Bauer's e-mail that described potential changes to the funding relationship between the university and the college. As a result,

appellant stated that he brought up the issue with Cannon. There is no indication that Sojka or anyone else at the university instructed appellant to discuss such matters with Cannon or any other official at OBR.

{¶ 43} Cannon testified that his conversation with appellant was "unusual" and he felt the need to inform the university regarding the contents of the call. (Tr. Vol. II at 288.) Specifically, Cannon testified that he wanted to inform the university that someone had inquired about the changes in the funding formula between regional colleges and a university's main campus. Cannon stated that he did not recall whether appellant asked OBR to intervene to prevent the university from taking funds from the college. Cannon also stated that he did not recall appellant stating that because "his dean did not bite * * * he wanted to run his request up the ladder to you." (Tr. Vol. II at 284.)

{¶ 44} Sojka stated that appellant's communication with Cannon demonstrated "[p]oor professional judgment," because "it [was] not up to [appellant] to seek a remedy with an individual who -- with whom other University officials communicate. It violated the chain of command and was unprofessional." (Tr. Vol. II at 425-26.) Sojka also testified that appellant's actions "caused a trust, confidence, communication gap." (Tr. Vol. II at 414.)

{¶ 45} Qualls testified that "[a]sking for the intervention and going over his dean's head all -- the sum total of the phone call and the context of the phone call was inappropriate." (Tr. Vol. II at 332.) Johnson testified that "[i]t's incredibly important that the University have an impeccable relationship with [OBR]" and "[i]t's very important we're all on the same page when we're interacting with OBR." (Tr. Vol. I at 82; 69.) Furthermore, Johnson stated:

> [T]here are times when you have people that you can contact at OBR, but I -- when I was a dean and even as a provost, if I contacted somebody, I would make sure my superior knew the conversations I was having and the interactions I was having to try and do that.
>
> And so in this case, none of that occurred. And, again, it was the content that was disturbing.

(Tr. Vol. I at 69.)

{¶ 46} Based on our review of record, we find there were differing accounts of the contents of appellant's call with Cannon. Significantly, neither appellant's nor Cannon's

testimony matched some of the statements in Qualls' e-mail to Johnson. Furthermore, neither Johnson nor Qualls spoke directly to Cannon or appellant regarding the contents of the conversation. Nevertheless, it is undisputed that appellant did not specifically receive permission to contact Cannon or to discuss the contents of Bauer's e-mail with Cannon. Therefore, competent, credible evidence supports the Court of Claims' finding that appellant failed to demonstrate by a preponderance of the evidence that appellee's reason for his termination was pretext for unlawful discrimination.

{¶ 47} In this case, the Court of Claims ultimately found appellant was terminated "for making the call to Cannon and not for any discriminatory reason." (Decision at 6.) Even if we were to find that appellee's reason was false, there is competent, credible evidence in the record that appellant failed to carry his ultimate burden of demonstrating that the university discriminated against him on the basis of his race or gender. Although the university's decision to terminate appellant's employment may have been based on incorrect or incomplete information, this does not necessarily compel the conclusion that appellee's action was based on unlawful discrimination. *See Griffin v. Finkbeiner*, 689 F.3d 584, 594 (6th Cir.2012) ("Racial animus is not the only inference that can be drawn from evidence that the proffered reason for an adverse employment action was pretext."). Having thoroughly reviewed the evidence and weighed the credibility of the witnesses, we cannot find that the Court of Claims erred in finding that discriminatory intent on the basis of race and gender was not the actual reason for appellant's termination. Appellant failed to carry his ultimate burden of demonstrating that the adverse employment action resulted from unlawful discrimination. *Williams* at ¶ 14; *St. Mary's Honor* at 515; *Hall* at ¶ 35; *Pla v. Cleveland State Univ.*, 10th Dist. No. 16AP-366, 2016-Ohio-8165, ¶ 23-27.

{¶ 48} Accordingly, we overrule appellant's sole assignment of error.

## IV. Conclusion

{¶ 49} Having overruled appellant's sole assignment of error, we affirm the judgment of the Court of Claims of Ohio.

*Judgment affirmed.*

TYACK, P.J., and BRUNNER, J., concur.

———————————