**[Cite as *McGinty v. Ohio State Univ.*, 2020-Ohio-2872.]**

| | |
|---|---|
| PETER MCGINTY | Case No. 2018-00026JD |
| Plaintiff | Magistrate Holly True Shaver |
| v. | <u>DECISION OF THE MAGISTRATE</u> |
| THE OHIO STATE UNIVERSITY | |
| Defendant | |

{¶1} Plaintiff brought this action alleging discrimination and retaliation in employment. The court granted summary judgment on plaintiff's claims of retaliation and the civil immunity of Adrienne Nazon. The case was tried to the undersigned magistrate on plaintiff's remaining claims of reverse race and sex discrimination.

**Summary of Testimony**

{¶2} Plaintiff (white male) grew up in Mansfield, Ohio, and graduated from The Ohio State University (OSU) in 1981 with a major in marketing and a minor in advertising. In 2013, after many years of working in the advertising and marketing field, plaintiff started to work for OSU as Associate Vice President of Strategic Marketing and Communications in the Office of Enrollment Services. Plaintiff described that working for OSU was his "dream job."

{¶3} In 2016, plaintiff applied for a new position at OSU, Chief Marketing Officer, which would serve as a marketing leader for the entire university. Although plaintiff was interviewed, Adrienne Nazon (black female), who had most recently worked at the University of Chicago, was ultimately selected for the position. Plaintiff was asked to interview for a position that would serve as Nazon's "number two," or second-in-command. Plaintiff was interviewed by Nazon, Justin Fincher (white male), Mike Eicher (white male), and Dolan Evanovich (white male). Plaintiff estimated that he met with Nazon approximately four times before he was selected. According to plaintiff, they talked about her expectations and vision for the university marketing department.

Plaintiff stated that he agreed that they could both align the university under a common brand.

{¶4} In mid-February 2016, plaintiff was selected as the Senior Associate Vice President in the university marketing department. According to plaintiff, Nazon never "anointed" him as her number two. Plaintiff was disappointed in the "matrix" reporting structure, where individuals would report to more than one supervisor. Plaintiff was surprised that he had only two direct reports. According to plaintiff, Nazon acknowledged that the matrix reporting structure was "unorthodox" and she told him that if it did not work they could try something else. Plaintiff believed in the ultimate vision of the marketing department, so he continued in the position.

{¶5} In the beginning of their employment relationship, plaintiff liked Nazon. He helped her interview other candidates to fill positions in the marketing department. Three Assistant Vice Presidents (AVPs) were hired. Plaintiff stated that he participated in the interviews to hire Brian Aubert (white male), Justin Winget (white male), and Melissa Bailey-Harris (black female). Although multiple candidates were interviewed for both Aubert and Winget's positions, plaintiff testified that Bailey-Harris was the sole candidate for her position. In addition, Nick Love (black male), had been hired as Senior Director of Social Media before plaintiff started. Both Bailey-Harris and Love had worked with Nazon at the University of Chicago and she recruited them for their positions at OSU.

{¶6} Plaintiff acknowledged that he made more money than the AVPs. For example, plaintiff's annual salary in fiscal year 2017 was $232,875.12. (Defendant's Exhibit BB.) In contrast, Aubert was paid $160,000, and both Bailey-Harris and Winget were paid approximately $150,000 per year. (Defendant's Exhibits NNN, MMM.) However, plaintiff testified that although he was paid more, he had no direct authority over the AVPs, and he considered them as peers because of the matrix reporting structure. Love's annual salary in 2016 was $110,000. (Defendant's Exhibit LLL.)

{¶7} Because of the significant changes involved with creating a university marketing department, turnover was extremely high, and many employees lost their jobs. According to plaintiff, Nazon informed him that she was not a "warm and fuzzy" person. In contrast, plaintiff testified that he was good at cultural leadership, listening to people, and he frequently counseled employees to "hang in there" and focus on the bigger picture of the department's goals.

{¶8} In July 2016, Nazon conducted a performance review of plaintiff. According to plaintiff, she praised him highly and he was thrilled to get such a great review. (Defendant's Exhibit W.) Although there were ongoing problems with the culture of the department and there was still high turnover, plaintiff felt they were moving forward as an organization.

{¶9} Between July and December 2016, plaintiff noticed things that he thought were concerning. Plaintiff testified that employees approached him "in tears" with requests to "do something." In response, plaintiff reached out to Stephanie Mizer and Cindy Silver in the central Human Resources (HR) department for advice. According to plaintiff, he had already brought some issues to Nazon's attention, such as his views that the department was not accomplishing its goals, that they were hurting relationships with clients, and that they were "breaking bridges." According to plaintiff, the marketing department was in "a sad state of affairs." Plaintiff testified that employees complained to him because they trusted him and thought he could help.

{¶10} One concern was employee Love. According to plaintiff, Love was very assertive and displayed a lack of emotional intelligence. Plaintiff witnessed Love screaming at Aubert, Love's supervisor. When plaintiff took his concerns about Love to Nazon, plaintiff testified that Nazon was defensive of Love and remarked that Love was behaving that way because Aubert was not properly managing him. Regarding Bailey-Harris, plaintiff described her as being dismissive and not receptive to his assistance.

Plaintiff also described her as a "bully." Plaintiff witnessed Bailey-Harris threaten other staff. According to plaintiff, Nazon protected both Bailey-Harris and Love.

{¶11} In September 2016, while plaintiff and Nazon were driving back from a regional campus in Marion, Ohio, Nazon received a phone call from Aubert, informing her that Love had resigned. According to plaintiff, Nazon pushed back against Aubert, told him how to manage Love, and remarked, "You guys don't know what it's like to be black. When Nick walks into a Target store, he has a target on his back. Put yourself in his shoes." Plaintiff stated that this statement shocked him because he viewed Love as a problematic employee, but Nazon viewed the situation as related to race and Aubert's failure to manage Love effectively.

{¶12} Plaintiff had a meeting with Nazon in December 2016 to discuss his view regarding problems in the marketing department. Plaintiff testified that he was frank with his observations that Bailey-Harris had 25 to 30 employees reporting to her under the matrix structure, and the office was not getting work done. Plaintiff told Nazon that if the current issues were not addressed, no progress could be made. Plaintiff suggested a list of ideas, such as restructuring Bailey-Harris' workload because he believed that she had too many responsibilities. According to plaintiff, Nazon became very angry. Her tone changed. According to plaintiff, Nazon said, "We're not changing. You're going to have to change. It's my way." Nazon asked plaintiff what he wanted to do, and when plaintiff stated he did not know, she stated, "Bullshit. You know what you want to do." When plaintiff left the meeting, he testified that, "I thought my whole career arc had just changed. I said to myself, 'I think I just lost my job.'" Plaintiff testified that he felt defeated, threatened, and unsafe. Plaintiff realized then that Nazon did not want discourse.

{¶13} According to plaintiff, after the December meeting, Nazon treated him differently. Nazon was more critical and dismissive of him. Plaintiff testified that other

people noticed a change in the relationship between himself and Nazon.  Nazon began to exclude plaintiff and work directly with his direct reports.

{¶14} Plaintiff described his experience at work in January and February 2017 as living in the "Twilight Zone."  According to plaintiff, the work that he had been praised for in the past was no longer good enough for Nazon, and he described her criticism of his work as "gaslighting."  Nazon had a two-hour session with plaintiff which was part of a review of his performance.  Then she scheduled additional follow-up meetings for his annual review which ended up totaling a combined seven hours to discuss his performance.  According to plaintiff, Nazon presented him with new expectations of his performance but gave him no authority to make changes.  In plaintiff's opinion, Nazon set him up to fail.  (See Plaintiff's Exhibit 19; Defendant's Exhibit PP.)

{¶15} In late April 2017, Nazon scheduled a one-on-one meeting with plaintiff at a Panera Bread restaurant near campus.  During the meeting, plaintiff testified that Nazon was extremely critical of his performance, and, in his opinion, she fabricated performance deficiencies and falsely suggested that he was not doing things well. (Defendant's Exhibit VV.)  On May 1, 2017, plaintiff met with Nazon again and presented her with a written response to her criticism.  (Plaintiff's Exhibit 23.)  After plaintiff had presented his response, Nazon told him that she had been doing a lot of thinking and that she believed that he was "not the right fit."  Nazon stated that she needed to go in a different direction and asked plaintiff to resign.  Plaintiff was upset. Plaintiff went to Jason Barnett in HR and asked whether there was another position that he could be placed in, but Barnett stated that there was no other option.

{¶16} Nazon announced plaintiff's resignation on May 10, 2017.   (Plaintiff's Exhibit 26.)  Plaintiff underwent an exit interview with Judy Varholla.  (Plaintiff's Exhibit 27.)  A few weeks later, plaintiff filed an anonymous complaint through OSU's ethics point website. (Plaintiff's Exhibit 28.)  Plaintiff testified that he had heard through other employees that Nazon was characterizing his departure in a negative way.   Plaintiff

testified that he filed the anonymous complaint because he had tried to follow the correct protocol with Nazon and HR but instead lost his job. Plaintiff testified that he felt compelled to help the employees who were still there but could not speak up about the punitive and toxic culture.

{¶17} During his employment, plaintiff took contemporaneous notes in a daily planner. (Plaintiff's Exhibit 40.) Plaintiff testified that the day after Nazon asked him to resign, she had a meeting with him. At some point during the meeting, Nazon made the remark, "You're a tall, white man. You'll have no trouble finding a job."

{¶18} Plaintiff applied for at least a dozen jobs but was not selected. Plaintiff started a consulting business known as Align 2 Market and has earned income therefrom. Plaintiff testified that the emotional impact of losing his job has been devastating to him. Plaintiff added that he is overqualified for most jobs that he has applied for, that he has undergone a tremendous financial hardship because of his termination, and that Nazon's characterization of his lack of talent has affected him deeply.

{¶19} On cross-examination, plaintiff admitted that Nazon had the authority to decide that his employment was not the right fit at any time. Plaintiff also agreed that he was an employee-at-will, and that his position as the sole Senior Associate VP had increased risk and uncertainty. Plaintiff acknowledged that it was important to have leadership alignment with Nazon, and that if she determined that he did not support her approach of the matrix organization, she could decide to change direction because she was his boss. Plaintiff admitted that he did not complain about discrimination based upon either gender or race in his exit interview, his ethics point complaint, or at any time during his employment. Plaintiff acknowledged that eventually, Holly Means, a white female, replaced him.

{¶20} Regarding the tall, white man comment, plaintiff testified that his notes reflect that Nazon made that comment while she was discussing plaintiff's strengths.

His notes state: "My strengths: Agency, Private Sector, Tall white ha ha, Strong presence ha ha ha Funny! Ha ha ha ha." (Plaintiff's Exhibit 40, last page.) Plaintiff testified that he interpreted Nazon's comments as her perception that it was a benefit for him to be a tall, white man with agency experience; that she stated he had a strong presence and that he was funny.  Plaintiff admitted that he did not write down the date that she made the comment, but that it would have been shortly after she asked for his resignation, because they were discussing networking contacts and next steps.

{¶21} Regarding which parts of Nazon's comments about his performance were fabricated, plaintiff testified that her criticism of his work about enrollment did not reflect the incredible work that had been done.  Plaintiff testified that he could not believe Nazon wrote that because there was no lack of discipline in enrollment.  In plaintiff's opinion, that criticism was false.  (Defendant's Exhibit VV.)

{¶22} Justin Winget (white male) testified that he is currently the creative director for the San Antonio Spurs, but that he worked at OSU from July 2016 through November 2018 as an AVP of creative and multimedia.  According to Winget, he observed that the relationship between plaintiff and Nazon was initially good but then it soured over time.  Winget stated that in December 2016, Nazon asked the AVPs to conduct a 360-degree evaluation of her.  At that time, plaintiff brought some systemic issues to Nazon's attention, particularly regarding Nazon and Bailey-Harris.  Winget testified that plaintiff's suggestion to restructure responsibilities did not sit well with either Nazon or Bailey-Harris.

{¶23} According to Winget, his own relationship with Nazon was initially positive.  However, in the summer of 2017, there was turmoil within the creative team.  Winget voiced some concerns to Nazon from the creative team, specifically about Bailey-Harris and the content process.  Winget testified that Nazon was dismissive of his feedback and that she accused him of pushing blame onto others.  In Winget's opinion, Nazon was not receptive to constructive criticism of Bailey-Harris, and once he offered

criticism, Nazon became "punitive." Winget ultimately resigned from OSU. He testified that the relationship with Nazon was "brutal" on a daily basis. Winget realized that the working environment was not conducive to his mental health and well-being. Winget observed that Nazon treated Love and Bailey-Harris more favorably than she treated other employees. Winget also testified that Nazon inquired about the promotion path for another black employee, Corey Favor. In Winget's opinion, Favor was not well-suited for promotion. Winget complained to HR about Bailey-Harris, but he testified that there was no follow-up from either HR or Nazon. Winget underwent an exit interview where he complained that Nazon did not support any of the AVPs with the exception of Bailey-Harris; that Nazon set forth a constantly fluctuating series of directives; that Nazon was dismissive; and, that she was vested in "being right." (Plaintiff's Exhibit 36). On cross-examination, Winget admitted that he did not complain of race or sex discrimination in his exit interview. Winget also testified that Nazon never made comments about his race or gender during his employment.

{¶24} Jim Burgoon (white male) testified that he worked for OSU from 1999 to October 2016. In 2016, he was the director of interactive media within the university marketing department. Burgoon reported to Bailey-Harris. Burgoon has known plaintiff for years although he has never supervised him. Burgoon testified that he observed the working relationship between plaintiff and Nazon. In Burgoon's opinion, plaintiff provided stable leadership, was calm, and supported Nazon's positions on issues. Burgoon testified that he left OSU because he disagreed with Nazon's changes, such as the reorganization of the marketing department and Nazon's interpersonal management skills. Burgoon testified that he had a professional relationship with both Nazon and Bailey-Harris.

{¶25} Nikia Reveal (white female) testified that she worked for OSU for 10 years until January 2019. From 2012 to 2016, Reveal worked as a senior creative director in university marketing. Reveal reported to Bailey-Harris and Winget as co-leaders. In

October 2016, Reveal was informed that her position was being eliminated. Reveal testified that she enjoyed working with plaintiff and that he was a good leader. When her position was being eliminated, Reveal went to plaintiff for support. According to Reveal, plaintiff supported Nazon's decision to eliminate her position and told her that Nazon had a vision for the future of the marketing department. Reveal also testified that her relationship with Winget and Bailey-Harris was not great, and that she felt that neither Winget nor Bailey-Harris valued her opinions or skills. Reveal stated that it was clear that Nazon and Bailey-Harris had an established relationship and that they trusted each other.

{¶26} On cross-examination, Reveal testified that when Nazon promoted her to senior creative director, she received new responsibilities and an increase in compensation. (Plaintiff's Exhibit SSS). She also testified that she never supervised plaintiff or any AVPs, and once her position was eliminated, she found a job for defendant as Project Manager in the Office of the President where she worked for approximately two years before she left to take a job at Huntington Bank. Reveal testified that she observed that the relationship between Nazon and plaintiff changed after December 2016. Reveal also testified that plaintiff told her what happened in the December 2016 meeting, when she was still working in the department for Winget and Bailey-Harris.

{¶27} Brian Aubert (white male) testified that he was an AVP at OSU from July 2016 to January 2019. According to Aubert, he was impressed with plaintiff's work. Aubert testified that plaintiff was a leader at OSU and had years of experience. Aubert observed the working relationship between plaintiff and Nazon. Aubert stated that initially, their relationship was strong, and they exhibited a lot of camaraderie. However, once cultural issues developed, and friction began to grow among the teams in the marketing department, Aubert observed a drastic change. Aubert described plaintiff as a "truth-teller" to Nazon. Aubert testified that a lot of employees went to plaintiff to

complain about Nazon when they did not feel comfortable expressing their concerns directly to her. Aubert also testified that he observed the working relationship between Nazon and Bailey-Harris. According to Aubert, it was different than the relationship that Nazon had with other employees. Aubert stated that he felt like Nazon displayed favoritism toward Bailey-Harris in that she preferred her and protected her in many cases, whereas Nazon was more critical of other AVPs. Aubert testified that initially, his relationship with Nazon was positive but it quickly turned "awkward" because of employee Love. Aubert was Love's supervisor and Aubert testified that Love's behavior in the office, work product, performance, and communication skills were poor. Aubert cited examples of Love yelling at him in front of others, being insubordinate, and using vulgar language at work. Aubert had written an action plan for Love, and later recommended that he be terminated. When Aubert questioned Nazon whether Love was a good fit, Nazon dismissed his criticisms of Love and told Aubert she thought Aubert was triggering Love's behavior. According to Aubert, no other employee's behavior was tolerated in this way. Aubert testified that his relationship with Nazon suffered from a lack of trust and that it never recovered following this discussion.

{¶28} When Aubert left OSU, he underwent an exit interview with Stephanie Mizer. (Plaintiff's Exhibit 37.) Aubert described a toxic culture in the workplace. He testified that Nazon did not support him, he could not give Nazon transparent feedback, there were never clear standards, and that there was no clear decision-making framework. Aubert testified that whenever he challenged Nazon, a secondary meeting was scheduled which could last hours and usually involved just listening to her. Aubert stated that he had never experienced anything like Nazon's behavior anywhere else he had worked. Aubert described the work environment as a "culture of indecision" with no clear measurement of performance. He stated that the lack of clarity at the top caused a lot of the toxic culture and ambiguity and consternation in the entire organization.

{¶29} On cross-examination, Aubert testified that in October 2016, he concluded that Love should no longer work at OSU. Instead of being terminated, Nazon assigned Love and Aubert to coaching. Aubert testified that Love resigned twice: once in 2016 after which Nazon convinced him to stay, and ultimately in March 2017 when he left OSU. Although Aubert was assigned to coaching, his salary was not reduced, and his title did not change. Aubert did not complain of race or sex discrimination in his exit interview.

{¶30} Amy Scott (white female) testified that she graduated from OSU in 1992 and began working there in 2013. Scott was one of plaintiff's direct reports. According to Scott, plaintiff had a great work ethic and was always available to solve problems. Scott testified that plaintiff agreed with Nazon's vision for the department, but that it was difficult to understand Nazon's expectations. Scott worked with the alumni association who informed her that they did not want to work with Love due to his unprofessional behavior. According to Scott, Nazon blamed her for the friction that Love caused and told her that the alumni association did not want to work with her. Scott testified that plaintiff told her that he spoke to Nazon critically in the December 2016 meeting, and that plaintiff perceived his confrontation as being "risky."

{¶31} Justin Fincher (white male), Associate Vice President in Advancement, testified that he served on the search committee and that Nazon was selected for her deep amount of marketing experience and demonstrated knowledge in analyzing, measuring, and identifying key audiences with marketing discipline. Fincher worked with Nazon to select plaintiff as a number two position for her. Fincher testified that hiring the AVPs was Nazon's idea.

{¶32} In the summer and early fall of 2016, Fincher described the culture of the department as going through a "storming process," in that there was a lack of clarity for all processes and everyone was trying to sort everything out. According to Fincher, Nazon approached him to discuss problems she was having with plaintiff in the fall of

2016, when plaintiff was creating his goals for the year.  Fincher testified that Nazon had concerns about measuring work with milestones.  Fincher discussed with Nazon the need to set goals for plaintiff, to document her goals with particularity, and to set expectations for the team.  Fincher observed that Nazon and plaintiff had very different styles.  According to Fincher, Nazon is always in fifth gear, is very direct, and wants to know how to get from Point A to Point B quickly.  In contrast, Fincher described plaintiff as being more subtle and optimistic, and building a team with collaboration from the ground up.  Fincher testified that Nazon expected plaintiff to solve problems before she was aware of them.  During the mid-year performance process, Nazon informed Fincher that plaintiff was not meeting the goals that someone in his position should.  According to Fincher, Nazon expressed to him that plaintiff should show people he was her number two by his actions, instead of her "announcing" that he was the number two.  Fincher encouraged Nazon to put her concerns in writing and provided her with a tool to address her concerns about plaintiff's performance.  (Defendant's Exhibit SS.) However, Nazon did not ultimately put plaintiff on a formal improvement plan.  Fincher testified that it was Nazon's decision to ask plaintiff to resign.

{¶33} After plaintiff resigned, Fincher met with him for lunch.  Fincher testified that plaintiff was still in a state of disbelief that he had been asked to resign.  Fincher testified that plaintiff did not raise issues of gender or race discrimination with him either during or after his employment.

{¶34} On cross-examination, Fincher testified that Nazon did not need anyone's approval to hire or fire plaintiff.  Regarding cultural issues, Fincher conceded that Nazon might have been causing some of the problems, and he agreed that it would not have been helpful for Nazon to behave in a dismissive or punitive manner.  (See Defendant's Exhibit LL, December 14, 2016 email from Jason Barnett to Fincher regarding culture problems in the marketing department.)  However, Fincher also testified that as a senior leader, plaintiff was not meeting benchmarks against the strategic plan, and he was not

solving the cultural issues. As an example, Fincher stated that in the fall of 2016, he met with plaintiff about deliverables for the alumni association. Fincher testified that plaintiff and Amy Scott were not delivering with the digital strategy. When Fincher would meet with plaintiff, plaintiff would describe what cultural issues were arising, but he was not working to solve the issues himself. Fincher described his own role as to support and advise Nazon. According to Fincher, some of Nazon's criticisms of plaintiff included that he had no clear milestones, that he was not delivering expectations in the time frame that she expected, and that he did not solve problems before he took them to her. By October 2016, Fincher thought it was clear that plaintiff was not meeting Nazon's expectations.

{¶35} Adrienne Nazon testified that she is currently the Vice President of Marketing Advancement and that she has worked for defendant for approximately four years. She graduated from Howard University in 1986 and obtained a Master of Business Administration from the University of Chicago in 2012. Nazon has worked for a variety of businesses such as Westinghouse, Kraft Foods, and Quaker Oats. In 2005, Nazon began her employment with the University of Chicago and was the Director of Digital Marketing there for approximately ten years. A recruiter contacted Nazon for her eventual role at OSU.

{¶36} According to Nazon, her role was new for OSU. The role was to perform strategic branding and marketing in a modern concept. Nazon knew that her role and the idea of marketing for the entire university would be a significant shift and a major change for current employees who were accustomed to former ways of doing business. Nazon was aware that certain employees would not welcome change. Nazon was responsible for hiring a team of employees with a depth of skills and the capacity to grow.

{¶37} Nazon testified that Mike Eicher introduced her to plaintiff, and to her, it seemed like plaintiff would be a good fit for a number two position. Nazon was looking

for a "thought partner" who could help her navigate the university and grow the organization to be modern marketers.  Nazon and plaintiff established a rapport and she found him friendly and affable.  According to Nazon, she and plaintiff had many discussions about plaintiff's responsibilities to support the AVPs who had less experience, and to grow the culture and move things forward.

{¶38} Nazon testified that it was her decision to structure the AVPs the way she did.  Nazon made the decision to hire and set the salaries for the AVPs.  Nazon had worked with Bailey-Harris at the University of Chicago, and her impression of Bailey-Harris was very good.  Nazon had also worked with Nick Love at the University of Chicago.  Nazon described Love's work there as "stellar," and she hired him because of his depth of knowledge with social media strategy.

{¶39} Nazon testified that she gave plaintiff an "excels" review at the end of the fiscal year in July 2016.  (Defendant Exhibit W.)  In October 2016, Nazon identified six goals for plaintiff.  (Defendant's Exhibit FF.)  Nazon testified that plaintiff had concerns about the matrix organization, and she asked him to invest in how matrix organizations work.  Nazon stated that she wanted plaintiff to align with her philosophy.  In late 2016, plaintiff approached Nazon to discuss the leadership team.  According to Nazon, plaintiff was concerned that Winget and Bailey-Harris were not performing in their AVP roles successfully and plaintiff wanted to have their direct reports report to him instead.  Plaintiff was still concerned about the matrix structure and wanted to restructure it.  In February 2017, Nazon conducted a mid-year review of plaintiff.  (Defendant's Exhibits PP, QQ.)  Nazon discussed with Jason Barnett her concern that plaintiff was not equipped to handle what she wanted from the number two position regarding leadership and competency in areas such as supporting fundraising.  According to Nazon, plaintiff remarked to her that the position was "not what [he] signed up for."  Nazon testified that she and Barnett drafted Defendant's Exhibit SS to address her concerns, but she quickly came to the realization that plaintiff was not the right fit for the position any

longer. Nazon met with plaintiff on May 1, 2017, where she informed him that she needed to go in a different direction and asked for his resignation. Nazon stated that there were so many struggles in management, leadership, and expertise in digital marketing that she made the decision to ask for plaintiff's resignation. According to Nazon, she needed someone who could accelerate the pace, and plaintiff had demonstrated a lack of sophistication for the role. Nazon testified that she did not base her decision on plaintiff's race or gender. Nazon denied making any comments about plaintiff being a tall, white man.

{¶40} With regard to Love, Nazon testified that she thought that plaintiff could have talked to Love about the OSU culture to help him acclimate to it. She also stated that she felt her role was to help Aubert deal with challenging personalities, and coach Aubert to coach Love better. Nazon testified that she had a discussion with plaintiff about Nick Love on the way back to campus when Aubert called her and told her that Love had resigned. Nazon told plaintiff that she thought Aubert had "failed" Love but denied saying that Aubert or plaintiff did not know what it was like to be a black man. According to Nazon, the University of Chicago was a very "in your face" place, where challenging ideas was the norm. Nazon testified that at OSU, if you challenge ideas, you are perceived as challenging the person. Nazon stated that OSU had invested a lot in Love and she wanted him to stay.

{¶41} Nazon stated that Holly Means, a white female, was hired after a search process to replace plaintiff. According to Nazon, Means possesses a depth of strategic leadership and marketing experience. Nazon described Means as a strategic thought partner and stated that she does "incredible" work.

{¶42} On cross-examination, Nazon testified that she was never informed that the alumni association no longer wanted to work with Nick Love. She pointed to an email to plaintiff dated March 1, 2017, as a point in time when she believed plaintiff had a competency issue, not a willingness issue. (Defendant's Exhibit QQ.) When asked

what had changed from plaintiff's first evaluation to his second, Nazon stated that there were many things. For example, when Nikia Reveal was not chosen as a senior strategist, plaintiff told Nikia, "I fought for you." Nazon told plaintiff that he should maintain an objective viewpoint and not "break ranks" with her.

{¶43} Regarding Bailey-Harris, Nazon testified that she is currently removing creative content as a responsibility of Bailey-Harris but maintained that the change she is making was not the same change that plaintiff had suggested in his December 2016 meeting. Nazon acknowledged that Bailey-Harris has some opportunities to grow. Furthermore, Nazon testified she did not believe that people felt that she displayed favoritism toward Love or Bailey-Harris, despite Plaintiff's Exhibit 35, which is an email dated August 2, 2017, regarding an ethics point complaint alleging that Nazon becomes a bully when challenged, that Bailey-Harris is incompetent, and that Nazon does not acknowledge any criticism of Bailey-Harris. Nazon also testified that in her opinion, Bailey-Harris and she are nothing alike. Nazon testified that she appreciates how some people might feel, but she denied engaging in favoritism, even though Barnett brought allegations of favoritism and cronyism to her attention in October 2016. (Plaintiff's Exhibit 15.) Nazon denied that plaintiff complained that she was constantly changing her expectations of his performance.

{¶44} David Boyd, a forensic economic consultant, testified that he prepared reports for the economic loss that plaintiff has sustained as a result of his termination. (Plaintiff's Exhibits 45-47.) Boyd testified that to a reasonable degree of economic certainty that plaintiff has incurred economic damages in the amount of over 1 million dollars. (Plaintiff's Exhibit 47.)

**Law and Analysis**

### I. Race and Sex Discrimination

{¶45} R.C. 4112.02 provides, in pertinent part, that: "It shall be an unlawful discriminatory practice: (A) For any employer, because of the race * * * [or] sex * * * of

any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any other matter directly or indirectly related to employment."

{¶46} "'To prevail in an employment discrimination case, a plaintiff must prove discriminatory intent' and may establish such intent through either direct or indirect methods of proof." *Dautartas v. Abbott Labs.*, 10th Dist. Franklin No. 11AP-706, 2012-Ohio-1709, ¶ 25, quoting *Ricker v. John Deere Ins.* Co., 133 Ohio App.3d 759, 766 (10th Dist.1998). In Ohio, "federal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000(e) et seq., Title 42, U.S. Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Plumbers* & *Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.*, 66 Ohio St.2d 192, 196 (1981).

## A. Direct method of proof

{¶47} "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir.1999). Direct evidence "does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir.2003). In order for a statement to be evidence of an unlawful employment decision, plaintiff must show a nexus between the improper motive and the decision-making process or personnel. "Accordingly, courts consider: (1) whether the comments were made by a decision maker; (2) whether the comments were related to the decision-making process; (3) whether they were more than vague, isolated or ambiguous; and (4) whether they were proximate in time to the act of alleged discrimination." *Birch v. Cuyahoga Cty. Probate Court.*, 173 Ohio App.3d 696, 705, 2007-Ohio-6189, ¶ 23 (8th Dist.). However, "stray remarks, remarks by non-decision

makers, comments that are vague, ambiguous, or isolated, and comments that are not proximate in time to the act of termination" do not constitute direct evidence. *Johnson v. Kroger Co.*, 160 F. Supp.2d 846, 853 (S.D.Ohio 2001), rev'd on other grounds, 319 F.3d 858 (6th Cir.2003).

{¶48} Upon review of the evidence at trial, the court finds that plaintiff's testimony was more credible than Nazon's testimony regarding the comments that Nazon made. Therefore, the court finds that Nazon made the comments that plaintiff attributes to her regarding Nick Love and regarding plaintiff being a tall, white man. There is no dispute that Nazon was the decision-maker regarding plaintiff's employment.

{¶49} However, Nazon made the comments about Love during a car ride back from a regional campus in the fall of 2016. Plaintiff was asked to resign on May 1, 2017. The evidence shows that any comments that Nazon made in the car ride in the fall of 2016 are not proximate in time to Nazon asking for plaintiff's resignation in May 2017. Furthermore, Nazon's statements in the car do not relate to the decision-making process of asking plaintiff for his resignation. Therefore, these comments do not constitute direct evidence of discrimination as a matter of law.

{¶50} Turning to the comments that Nazon made shortly after she asked for plaintiff's resignation, the court finds that plaintiff's testimony was credible that Nazon made the statement that he would have no problem finding a job because he was a tall, white man. In addition, the court finds that plaintiff was credible that Nazon made the statement to him in the days after May 1, 2017, when they were discussing next steps after his departure from OSU. Therefore, plaintiff has proven that Nazon made the statement, that she was the decision-maker, and that she made the statement proximate in time to the act of his termination. However, the court further finds that the comment does not constitute direct evidence of discrimination. Plaintiff testified that Nazon made the comment in a discussion about his strengths, and that she was discussing the experience he had and what he could offer to his next employer. But

Nazon's comment does not demonstrate that she asked plaintiff to resign because he was a tall, white man.  Therefore, the court concludes that Nazon's statements in May 2017 do not constitute direct evidence of discrimination.

{¶51} However, even if plaintiff had proven direct evidence of discriminatory animus, "'the burden [of production and persuasion] shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive.'"  *Minadeo v. ICI Paints*, 398 F.3d 751, 763 (6th Cir.2005).  The evidence shows that Nazon would have made the same decision to ask for plaintiff's resignation absent any impermissible motive because by December 2016, Nazon was aware that plaintiff did not share her vision on how to move the department forward under the matrix reporting structure, and that plaintiff was not meeting her expectations.

## B.  Indirect method of proof

{¶52} To establish a prima facie case of reverse race or sex discrimination under Title VII and Ohio law, a plaintiff must show: "1) background circumstances that support the suspicion that the defendant is the unusual employer that discriminates against the majority; 2) that the plaintiff was qualified for the position; 3) that the plaintiff was subjected to an adverse employment action by the defendant; and, 4) that the plaintiff was replaced by a person outside of the majority class or that the defendant treated similarly situated persons outside of the majority class differently."  (Internal citations omitted.)  *Hardesty v. Kroger Co.*, Case No. 1:16-cv-367, 2018 U.S. Dist. LEXIS 46290, *11-12 (S.D. Ohio March 21, 2018).  *See also Pohmer v. JPMorgan Chase Bank, N.A.*, 10th Dist. Franklin No. 14AP-429, 2015-Ohio-1229, ¶ 32, citing *Mowery v. Columbus*, 10th Dist. Franklin No. 05AP-266, 2006-Ohio-1153, ¶ 44.

{¶53} "The 'background circumstances' requirement is not onerous, and can be met through a variety of means, such as statistical evidence; employment policies demonstrating a history of unlawful racial considerations; evidence that the person responsible for the employment decision was a minority; or general evidence of ongoing

racial tension in the workplace." *Hardesty*, *supra*, at *13, citing *Johnson v. Metro. Gov't of Nashville & Davidson County*, 502 Fed. App'x 523, 536 (6th Cir.2012). The Sixth Circuit has held that a plaintiff may satisfy the first element in a reverse discrimination case by showing the person who decided to take adverse action against the plaintiff is not a member of the majority class. *See Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 257 (6th Cir.2002) (reverse race discrimination case); *Grace v. Univ. of Cincinnati*, Case No. 1:10-cv-315, 2011 U.S. Dist. LEXIS 148221, at *12-13 (S.D. Ohio Aug. 19, 2011) (reverse sex discrimination case.)

{¶54} Since Nazon is a black female, plaintiff has met his non-onerous burden of background circumstances for the first element of a prima facie case of reverse race and sex discrimination. There is no dispute that plaintiff was qualified for his position and that Nazon asked him to resign. Regarding the fourth element, plaintiff was replaced by Holly Means, a white female. Accordingly, the subsequent hiring of Means supports plaintiff's reverse sex discrimination claim but undermines his reverse race discrimination claim based upon replacement. However, plaintiff asserts he can state a prima facie case of reverse race discrimination based upon Nazon's more favorable treatment of Bailey-Harris. In the court's decision on summary judgment, the court found that Love was not a comparable employee to plaintiff because Love reported to Aubert, not Nazon, had a position significantly different than plaintiff, and was paid less than half of plaintiff's salary. However, the court stated that since plaintiff and Bailey-Harris both reported to Nazon, reasonable minds could reach different conclusions on whether Bailey-Harris was a comparable employee to plaintiff.

{¶55} "To be deemed 'similarly situated', the comparables 'must have dealt with the same supervisor, have been subjected to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" (Internal citations omitted.) *Tilley v. Dublin*, 10th Dist. Franklin No. 12AP-998, 2013-Ohio-4930, ¶ 34.

"Differences in job title and responsibilities, experience, and disciplinary history may establish that two employees are not similarly situated." *Campbell v. Hamilton County*, 23 F.App'x 318, 325 (6th Cir.2001). It is undisputed that plaintiff had over 20 years of experience and was making significantly more money than Bailey-Harris.

{¶56} Upon review of the testimony and evidence presented at trial, the court concludes that the difference in salary and years of experience between plaintiff and Bailey-Harris show that plaintiff was not comparable to Bailey-Harris. Furthermore, plaintiff's responsibilities as the number two to Nazon differed significantly from Bailey-Harris' responsibilities. Therefore, the court finds that plaintiff did not have any comparable employees to him, and that his claim for reverse race discrimination fails on this basis. However, the court does find that plaintiff has met his burden of establishing a prima facie case of reverse sex discrimination.

{¶57} The burden then shifts to defendant to produce a legitimate, non-discriminatory reason for plaintiff's termination. The legitimate, non-discriminatory reason for plaintiff's termination was that he was not meeting Nazon's expectations. Both Nazon's testimony and Fincher's testimony support this conclusion. Upon review, the court finds that defendant has articulated a legitimate, non-discriminatory reason for plaintiff's termination.

{¶58} "If the employer meets its burden of production, a plaintiff must prove by a preponderance of the evidence that the employer's legitimate nondiscriminatory reason is merely a pretext for unlawful discrimination." *You v. Northeast Ohio Med. Univ.*, 10th Dist. Franklin No. 17AP-426, 2018-Ohio-4838, ¶ 47.

{¶59} "To establish pretext, a plaintiff must demonstrate that the proffered reason [for the adverse employment action] 1) has no basis in fact, 2) did not actually motivate the employer's challenged conduct, or 3) was insufficient to warrant the challenged conduct. * * * Regardless of which option is chosen, the plaintiff must produce sufficient evidence from which the trier of fact could reasonably reject the employer's explanation

and infer that the employer intentionally discriminated against him. * * * A reason cannot be proved to be a pretext for discrimination unless it is shown *both* that the reason was false, and that discrimination was the real reason." (Emphasis added.) (Internal citations omitted.) *Knepper v. Ohio State Univ.*, 10th Dist. Franklin No. 10AP-1155, 2011-Ohio-6054, ¶ 12. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dept. of Cmty Affairs v. Burdine,* 450 U.S. 248, 253 (1981).

{¶60} Plaintiff cannot "simply show that the employer's decision was wrong or mistaken, 'since the factual dispute at issue is whether the discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.'" *Kundtz v. AT&T Solutions, Inc.*, 10th Dist. Franklin No. 05AP-1045, 2007-Ohio-1462, ¶ 37, quoting *Fuentes v. Perskie*, 32 F.3d 759, 765 (3rd Cir.1994). "Further it is not the role of the judiciary to 'second guess business judgments by an employer making personnel decisions.'" *Morissette v. DFS Servs., LLC,* 10th Dist. Franklin No. 12AP-611, 2013-Ohio-4336, ¶ 40, quoting *Manofsky v. Goodyear Tire & Rubber Co.*, 69 Ohio App.3d 663, 669 (9th Dist.1990).

{¶61} Upon review of the evidence presented at trial, the court finds that plaintiff's testimony was credible and that the evidence shows that once plaintiff was very frank with Nazon about his assessment of the department and its employees, Nazon did not share his views and dismissed his criticism. The court did not find Nazon's testimony credible or persuasive regarding her lack of knowledge that the alumni association did not want to work with Love, or that she was unaware of any complaints about Bailey-Harris. Emails that were admitted as exhibits directly contradict Nazon's testimony. The court further finds that the work environment was extremely challenging and that there was a cultural difference between Nazon and the employees she recruited from the University of Chicago, and existing employees of OSU. The court finds that Nazon showed favoritism toward Bailey-Harris and Love, but the evidence also shows that she

had established working relationships with them before she hired them at OSU. "An employer may also make hiring decisions based on its familiarity and personal relationships with candidates." *McDaniels v. Plymouth-Canton Cmty. Sch.*, 755 Fed.Appx. 461, 470 (6th Cir.2018). Plaintiff cannot establish an inference of discrimination on the basis of race or sex with evidence that Nazon was friendlier toward Love and Bailey-Harris than she was to him. *See Morris v. Shinseki*, 18 F.Supp.3d 923, 934-35 (S.D.Ohio 2014); *Thompson v. McDonald,* 169 F.Supp.3d 170, 185 (D.D.C.2016).

{¶62} Despite finding that plaintiff's testimony was more credible than Nazon's, the court also finds that plaintiff has failed to prove by a preponderance of the evidence that the legitimate, nondiscriminatory reason for his termination-that Nazon was not satisfied with his performance-had no basis in fact, did not actually motivate the employer's conduct, or was insufficient to warrant the challenged conduct. Although plaintiff disagrees with Nazon's assessment of his abilities, he served at her pleasure. Furthermore, plaintiff's burden of proof is to show that the reason was pretextual and that reverse race and/or sex discrimination was the real reason he was fired. Plaintiff's own testimony, that he thought he lost his job when he confronted Nazon in December 2016, is persuasive to the court that Nazon did not ask for his resignation because he is a white male.

{¶63} For the foregoing reasons, the court finds that plaintiff has failed to prove his claims of reverse race and reverse sex discrimination by a preponderance of the evidence. Accordingly, judgment is recommended in favor of defendant.

{¶64} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of*

*any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

_____
HOLLY TRUE SHAVER
Magistrate

**Filed March 31, 2020**
**Sent to S.C. Reporter 5/8/20**